## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| American Association of University Professors, 1133 Nineteenth Street NW, Suite 200 Washington, DC 20036; | |
| Rodrigo Cerna-Chavez, | No. 26-CV-___ |
| William Daniel Moscoso-Barrera, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Yu-Ting Tsai; | |
| Aldo Salvador Estrada-Montaño, | |
| Ma. Elena Hernandez Cepeda, | |
| and | |
| Richmond Djorgbenoo, | |
| *Plaintiffs[1]*, v. | |
| U.S. Department of Homeland Security, 245 Murray Lane SW, Washington, DC 20528-0001; | |
| U.S. Department of State, Harry S. Truman Building, 2201 C Street NW, Washington, DC 20520; | |
| U.S. Department of Commerce, Herbert C. Hoover Building, 1401 Constitution Avenue NW, Washington, DC 20230; | |
| United States Citizenship and Immigration Services, 111 Massachusetts Avenue NW, Washington, DC 20529-2260; | |
| Kristi L. Noem, in her official capacity as Secretary of the Department of Homeland Security, 245 Murray Lane SW, Washington, DC 20528-0001; | |

---

[1] Plaintiffs' addresses not included in the caption are being filed under seal by notice pursuant to LCvR 5.1(c)(1).

Marco A. Rubio, in his official capacity as Secretary
of the Department of State,
Harry S. Truman Building, 2201 C Street NW,
Washington, DC 20520;

Howard Lutnick, in his official capacity as Secretary
of the Department of Commerce,
Herbert C. Hoover Building, 1401 Constitution
Avenue NW, Washington, DC 20230; and

Joseph B. Edlow, in his official capacity as Director
of United States Citizenship and Immigration
Services,
111 Massachusetts Avenue NW, Washington, DC
20529-2260,

                                        *Defendants*.

## INTRODUCTION

1.      This lawsuit challenges the Trump Administration's creation and implementation of a "Gold Card" visa program in contravention of Congress's exclusive authority to regulate immigration and to raise revenue. By giving priority consideration to and awarding visas to individuals who can pay $1 million, rather than to highly talented individuals whose admission would benefit the United States, the program runs counter to the laws enacted by Congress.

2.      Through Executive Order and final agency action, the Trump Administration has created and implemented the payment-linked Gold Card program that alters how immigrant classifications, including the EB-1A "extraordinary ability" and EB-2 "exceptional ability" preference categories, are defined and how applications are processed. Under this program, Defendants treat a payment—which they term a "gift"—of at least $1 million by an individual, or $2 million by a corporation on behalf of an individual, to Defendant U.S. Department of Commerce ("Commerce Department") as "evidence of eligibility" for those statutory classes of visas. This new pay-to-play program displaces the existing employment-based visa system and prioritizes wealth over intellect or ability. That displacement has real consequences: Congress caps the number of EB-1 and EB-2 visas that can be issued each year and requires that they be allocated in the order in which applications are filed. As a result, apart from the Gold Card program, applicants proceed through an orderly queue to be considered for a limited annual allotment—often with multiyear waits when applications outnumber available visas. The Gold Card program will increase those waits and result in qualified, merits-based applicants not being awarded visas.

3.      By treating a payment to Defendant Commerce Department as evidence of statutory eligibility for EB-1 and EB-2 visas, and expediting consideration of applications from individuals who make the payment, Defendants both exceed their statutory authority and act contrary to long-standing laws and policies designed to attract highly talented individuals to the United States. By

1

conditioning access on payment, the Gold Card program allows visas to be bought, and thereby takes visas away from the people to whom federal statute specifies they should be awarded—scientists and engineers, physicians, researchers, and other accomplished individuals whose admission would substantially benefit the United States.

4.    President Trump and Defendant Secretary of Commerce Lutnick have publicly boasted about "selling" access to the United States and United States citizenship through the Gold Card. By substituting a seven-figure payment for the attributes Congress deemed relevant to employment-based immigration, the program places a premium on wealth over the statutory eligibility criteria. As President Trump explained, "wealthy people will be coming into our country by buying this card."[2] Rather than reserving those visas for the world's best and brightest, the Gold Card program converts the visas into revenue-generating commodities sold to those who can pay $1 million or more.

5.    Beyond its inequity, the program imposes concrete harms on qualified applicants for EB-1 and EB-2 visas. By its design, the Gold Card program causes the displacement of statutorily qualified applicants given the limited number of available visas and the preferential treatment of Gold Card applications. The program delays the processing and adjudication of applications from highly skilled individuals who, as required by the Immigration and Nationality Act ("INA"), are poised and ready to contribute to the United States in the sciences and arts, education, business, and even athletics. In a system where demand for EB-1 and EB-2 visas exceeds annual supply, a paid fast lane that consumes visas and agency processing capacity necessarily pushes back qualified applicants who will have to wait longer for their applications to

---

[2] Michael Williams & Piper Blackburn, *Trump says US will sell $5 million 'gold cards" to wealthy foreigners*, CNN (Feb. 25, 2025), https://www.cnn.com/2025/02/25/politics/us-gold-card-foreigners-trump/index.html.

be considered and may ultimately not be awarded a visa.

6.    At bottom, the Gold Card program overrides Congress's choices—both as to who qualifies for employment-based immigration and how and under what conditions agencies may collect revenue. And it does so at the expense of qualified EB-1 and EB-2 applicants, who are effectively crowded out of limited annual visa allotments as visas are steered to Gold Card recipients.

7.    These concrete harms flow from a program that is unlawful for several independent reasons.

8.    First, in creating and implementing the Gold Card program, Defendants—the Departments of Homeland Security, State, and Commerce, the U.S. Citizenship and Immigration Services, and their Secretaries or Directors (collectively, Defendants)—have exceeded the authority conferred by Congress and acted without statutory authority. Defendants' creation and implementation of the Gold Card program is thus in excess of statutory authority.

9.    Second, in creating and implementing the Gold Card program, Defendants have violated core features of the long-standing employment-based visa system created by the INA and subsequent legislation. Defendants' creation and implementation of the Gold Card program is thus contrary to law.

10.    Third, in creating and implementing the Gold Card program, Defendants failed to articulate a satisfactory explanation for the program, including a reasoned analysis of the substantial changes in agency policy the program affected *sub silentio*. Those actions are arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

11.    Fourth, Defendants failed to adhere to the APA's notice-and-comment rulemaking procedure, which is required when promulgating a rule that imposes legal consequences and sets

binding rules for the processing of applications—just as the Gold Card program does. For that reason, Defendants' creation and implementation of the Gold Card program was undertaken without procedure required by law, in violation of the APA.

12.    In addition, the President's and Defendants' actions in creating and implementing the Gold Card program are *ultra vires* because no statute authorizes treating a large payment as "evidence of eligibility" for EB-1A or EB-2 visas or for the grant of a national interest waiver ("NIW"), no statute authorizes treating a large payment as grounds for expediting consideration of applications, and no statute authorizes imposing a unique processing fee for EB-1A or EB-2 petitions submitted under a wealth-based program.

13.    No statute, moreover, authorizes the President or Defendants to raise revenue by offering advantages to applicants for EB-1A or EB-2 visas or NIWs in return for a payment to Defendant Commerce Department.

14.    The Court should declare the Gold Card program—Defendants' decision to treat a payment to Defendant Commerce Department as evidence of statutory eligibility for EB-1 and EB-2 visas and an NIW, and their decision to give expedited consideration to individuals and corporations who make a seven-figure payment—unlawful and enjoin its continued operation.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question). Plaintiffs seek relief under the APA, 5 U.S.C. §§ 702–706. This Court has additional remedial authority under 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act).

16.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are federal agencies and officers acting in their official capacities who perform their official duties in the District of Columbia, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

4

## PARTIES

17.    **Plaintiff American Association of University Professors** (AAUP) is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at colleges and universities throughout the country. The AAUP's mission is to advocate for its members in relation to all aspects of their relationship to their employers and federal, state, and local governments; advance academic freedom and shared governance; define fundamental professional values and standards for higher education; promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; help the higher education community organize to accomplish their goals; and ensure higher education's contribution to the common good. Founded in 1915, the AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in the country's colleges and universities. Many of Plaintiff AAUP's members are noncitizens in United States academic and research positions who are pursuing or are eligible to pursue employment-based immigrant visas under 8 U.S.C. § 1153(b), including EB-1 and EB-2 visas. Plaintiff AAUP and its members have an interest in American universities being able to hire and retain the most talented individuals in the world through the EB-1 and EB-2 visa pathways established by statute.

18.    **Plaintiff Rodrigo Cerna-Chavez** is a Mexican citizen. He is a biomedical researcher who specializes in the retina, using stem-cell-based laboratory models to investigate retinal diseases and evaluate potential drug treatments. He earned a Ph.D. in Biosciences from Newcastle University in the United Kingdom, where his dissertation employed stem-cell-derived retinal organoids and retinal pigment epithelium (RPE) models to study retinoblastoma and

support screening of chemotherapeutic agents. He also holds an M.Res. in Tissue Engineering and Regenerative Medicine from the University of Manchester in the United Kingdom.

19.     Dr. Cerna-Chavez conducted postdoctoral research at the Ocular Genomics Institute, Massachusetts Eye and Ear (Department of Ophthalmology, Harvard Medical School), in Boston, Massachusetts. He is also an affiliated postdoctoral fellow at the Broad Institute of MIT and Harvard. In those roles, he has helped make retinal organoid and RPE models more consistent and usable across experiments, applied CRISPR gene editing to engineer human stem-cell lines for retinal-disease modeling, and collaborated with bioinformatics researchers to interpret RNA sequencing data from retinal tissues. Dr. Cerna has authored peer-reviewed publications, including work published in *Stem Cell Reports*, *Stem Cells Translational Medicine*, *Experimental Eye Research*, *Stem Cell Research*, and the *International Journal of Molecular Sciences*. He has presented related findings at major vision and stem-cell conferences, including annual meetings of the Association for Research in Vision and Ophthalmology (ARVO) and the International Society for Stem Cell Research (ISSCR).

20.     Dr. Cerna is residing in Mexico and is preparing to apply for lawful permanent residence through an EB-1 petition as a scientist of extraordinary ability, based on his specialized research in retinal disease model systems.

21.     **Plaintiff William Daniel Moscoso-Barrera** is a Colombian citizen. He is an electronic engineer and applied scientist whose work focuses on the design, development, and clinical translation of biomedical devices and signal-processing systems, including wearable and portable technologies for sleep and pain management. He earned a Ph.D. in Applied Medicine and Biomedicine from the University of Navarra in Spain, and a master's degree in Design and Process Management from the University of La Sabana in Colombia.

6

22.    Dr. Moscoso is currently employed as an Assistant Professor of Biomedical Engineering at Marian University in Indianapolis, Indiana. Immediately prior, he was a Postdoctoral Fellow in the Department of Biomedical Engineering at the University of Texas at Austin, where he helped develop wearable-device and neuromodulation research and prepared NIH proposals and clinical-testing protocols. His work has been supported through competitive funded projects, including participation in an effort funded by the Defense Advanced Research Projects Agency (DARPA) of the United States Department of Defense concerning wearable neural interfacing systems for sleep restoration. Dr. Moscoso has served as co-investigator on government-funded biomedical technology development in Colombia and has authored peer-reviewed publications in biomedical engineering and related fields, including work in *Nature Communications*. He is an inventor on multiple patent filings and has been granted patents relating to biomedical devices and monitoring systems.

23.    Dr. Moscoso has filed an EB-1A petition, based on his record of research contributions and invention in biomedical engineering and medical-device technology. He is currently residing in the United States on a nonimmigrant H-1B visa, a classification reserved for people performing services in a specialty occupation.

24.    **Plaintiff Yu-Ting Tsai** is a citizen from Taiwan. He is an accomplished researcher and academic specializing in cancer biology, pharmacology, and immunotherapy. Tsai is currently pursuing a Ph.D. at Wake Forest University School of Medicine in the Department of Cancer Biology, where he is scheduled to complete his dissertation in May 2026. His doctoral research focuses on the innovative targeting of CD47/SIRPα signaling pathways in the brain tumor microenvironment, addressing critical challenges in cancer treatment. Prior to this, he earned a Master of Science in Molecular Pharmacology from Taipei Medical University, where his thesis

7

explored mechanisms of drug resistance in glioblastoma multiforme.

25.    Tsai's research is focused on cancer metabolism, immuno-metabolism, and therapeutic strategies for glioblastoma and breast cancer brain metastases. He has published numerous peer-reviewed articles in high-impact journals such as *Cell Reports Medicine*, *Lung Cancer*, *Redox Biology*, and *Journal of Biomedical Science*, and has presented his findings at prestigious conferences, including the Society for Neuro-Oncology (SNO) Annual Meeting and the SNO/American Society of Clinical Oncology (ASCO) CNS Metastases Conference. Tsai's innovative research has earned him multiple awards, including gold and silver honors at the Wake Forest School of Medicine's Surgical Science Research Day, and international recognition through travel awards and symposium features.

26.    Tsai has filed an EB-2 petition with a request for a national interest waiver (NIW) to continue his cancer research in the United States and lend his expertise to addressing critical healthcare challenges. He is currently in the United States on a nonimmigrant F-1 visa until he completes his doctoral degree by this summer.

27.    **Plaintiff Aldo Salvador Estrada-Montaño** is a Mexican citizen. He is a research scientist with expertise in organometallic, organic, and inorganic chemistry, electrochemistry, optical property characterization, and computational chemistry. He earned a Ph.D. in Chemical Sciences from the Center for Research and Advanced Studies of the National Polytechnic Institute (CINVESTAV) in Mexico City and holds an engineering degree in industrial chemistry from the Higher School of Chemical Engineering and Extractive Industries.

28.    Dr. Estrada was most recently employed as a Postdoctoral Fellow in the Department of Chemistry & Chemical Biology at McMaster University in Hamilton, Ontario. His work has combined synthetic chemistry with advanced characterization methods and computational

techniques. He has synthesized and analyzed organic, organometallic, and polymeric materials, which he has characterized using spectroscopic techniques, including nuclear magnetic resonance (NMR), infrared (IR), ultraviolet-visible (UV-Vis), and fluorescence spectroscopy, as well as electrochemical methods and X-ray diffraction. Additionally, he has employed quantum chemistry tools based on density functional theory (DFT) and time-dependent density functional theory (TD-DFT) to model structures, spectra, and the behavior of chemical reactions.

29.    Dr. Estrada's postdoctoral research has included the development of polymers for biomedical-device applications, such as reconfigurable intraocular lenses, the study of light-emitting organic systems, the monitoring of water quality in relation to heavy metals, and the investigation of iron-based organometallic compounds with high anticancer activity as an alternative to platinum-based chemotherapy treatments. The results of his research have been published in internationally peer-reviewed chemistry and materials-science journals, including *Dyes and Pigments*, *Organometallics*, *European Journal of Inorganic Chemistry*, and *Journal of Organometallic Chemistry*. He has also presented his work at international scientific conferences and meetings.

30.    Dr. Estrada has definite and concrete plans to apply for lawful permanent residence through an EB-2 petition with a request for an NIW as a self-petitioner, based on his scientific training and ongoing research work.

31.    **Plaintiff Ma. Elena Hernandez Cepeda** is a Mexican citizen. She is a psychologist with advanced training in clinical and health psychology, neuropsychology, and forensic psychology. She earned a Ph.D. in Psychology from Universidad Autónoma de Ciudad Juárez and a master's degree in Clinical and Health Psychology from Universidad Autónoma de Tamaulipas. She has also completed postgraduate coursework in Neuropsychological Evaluation

9

and Rehabilitation at Instituto Superior de Estudios de Occidente. Dr. Hernandez is currently employed as a Lecturer at the Universidad Autónoma de Ciudad Juárez and is an International Member of the American Psychological Association.

32.     Dr. Hernandez's professional work spans applied research, university teaching, and specialized clinical practice focused on children and adolescents. Her doctoral research examined child maltreatment among children and adolescents in migrant and transient populations, including work undertaken in collaboration with UNICEF. She has published on related topics and has presented her work at national conferences in Mexico, including conferences addressing violence in migration. Along with her research, Dr. Hernández has provided pediatric and adolescent-focused psychological services in hospital and private-practice settings, and she has taught university courses in clinical and forensic psychology and psychological assessment.

33.     Dr. Hernandez is preparing to file in the near term an EB-2 petition with a request for an NIW as a self-petitioner. She intends to bring her specialized research and clinical background to the United States to support evidence-based psychological assessment and treatment for children and adolescents affected by trauma and violence. Her work would include developing and disseminating standardized evaluation tools and training protocols for use in hospital and community-care settings, alongside direct patient care.

34.     **Plaintiff Richmond Djorgbenoo** is a Ghanaian citizen. He is an applied chemist whose work spans two research and applied areas: (1) functional foods and bioactive compounds relevant to chronic-disease prevention, and (2) advanced analytical method development and polymer characterization used in water-treatment, hygiene, and sustainable-materials applications. He earned his Ph.D. in Applied Chemistry from North Carolina Agricultural and Technical State University.

35.     Dr. Djorgbenoo currently works as a Senior Staff Scientist at a global water and hygiene solutions company, where he leads polymer characterization work and develops advanced analytical methods used to evaluate complex polymer systems relevant to industrial water and materials applications. His responsibilities include supporting research and development, as well as providing analytical support for regulatory and manufacturing needs. Dr. Djorgbenoo has authored peer-reviewed scientific publications, including articles in *Nutrients*, *Journal of Agricultural and Food Chemistry*, and *Biomaterials Science*, and has presented his work at national scientific meetings, including the American Chemical Society and related conferences. He has received multiple academic and professional awards, including dissertation and research presentation awards from North Carolina A&T and the Council of Historically Black Graduate Schools.

36.     Dr. Djorgbenoo has definite and concrete plans to apply for lawful permanent residence through the EB-2 NIW process as a self-petitioner, based on his ongoing work which is both of public-health and industrial importance. Dr. Djorgbenoo is currently residing in the United States under temporary employment authorization through the optional practical training (OPT) program.

37.     **Defendant U.S. Department of Homeland Security ("DHS")** is a federal executive department headquartered in Washington, D.C DHS is responsible for administering and enforcing the immigration laws, including through its component agency U.S. Citizenship and Immigration Services, which adjudicates employment-based immigrant petitions and applications for adjustment of status. Defendant DHS participated in the creation and implementation of the challenged Gold Card program.

38.     **Defendant Kristi L. Noem**, in her official capacity, is the Secretary of Homeland

11

Security and is responsible for DHS's creation and implementation of the challenged Gold Card program.

39.     **Defendant U.S. Citizenship and Immigration Services ("USCIS")** is a component agency of DHS. USCIS is responsible for adjudicating immigration petitions and applications, including employment-based immigrant petitions and applications for adjustment of status implicated by the challenged Gold Card program.

40.     **Defendant Joseph B. Edlow**, in his official capacity, is the Director of USCIS and is responsible for USCIS's implementation of the challenged Gold Card program.

41.     **Defendant U.S. Department of State ("State Department")** is a federal executive department headquartered in Washington, D.C. The State Department is responsible for the administration of immigrant visa processing abroad through U.S. embassies and consulates and for implementing policies that govern visa issuance and related procedures implicated by the challenged Gold Card program. Defendant State Department participated in the creation and implementation of the challenged Gold Card program.

42.     **Defendant Marco A. Rubio**, in his official capacity, is the Secretary of State and is responsible for the State Department's implementation of the challenged Gold Card program.

43.     **Defendant U.S. Department of Commerce ("Commerce Department")** is a federal executive department headquartered in Washington, D.C. The Gold Card Executive Order assigns the Commerce Department a central role in establishing and operating the contribution-based process marketed as a pathway to EB-1 and EB-2 visas, including coordinating with Defendants DHS and State Department in the creation and implementation of the challenged Gold Card program.

44.     **Defendant Howard Lutnick**, in his official capacity, is the Secretary of Commerce

and is responsible for the Commerce Department's implementation of the challenged Gold Card program.

<strong><u>FACTUAL AND LEGAL ALLEGATIONS</u></strong>

**I.      Legal Background**

    *A.      The EB-1A, EB-2, NIW and EB-5 Visa Categories*

45.    The authority to make rules for the admission of noncitizens into the United States is entrusted to Congress. Article I, section 8, clause 4 of the United States Constitution provides that Congress shall establish a "uniform Rule of Naturalization."

46.    Pursuant to its constitutional authority, Congress enacted the INA, which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)).

47.    Attracting highly skilled foreign-born workers has long been part of the United States' immigration policy. In 1990 Congress exercised its authority over immigration and naturalization by creating a preference system for employment-based immigrant visas reserved for the admission of highly talented individuals to the United States. Immigration Act of 1990 ("IMMACT"), Pub. L. No. 101-649, 104 Stat. 4978, 4987–88 (Nov. 29, 1990) (amending 8 U.S.C. § 1153). Congress designed this preference system to operate within fixed numerical caps and according to specified eligibility criteria, reflecting deliberate policy judgments about how to allocate a scarce public resource—lawful permanent resident visas.

48.    As part of this system, Congress created the EB-1A visa category, also known as the "Einstein visa." 8 U.S.C. § 1153(b)(1)(A). The EB-1A visa is reserved for individuals with

13

extraordinary ability in the sciences, arts, education, business, or athletics. Applicants must demonstrate extraordinary ability in their field and have achieved sustained national or international acclaim. 8 U.S.C. § 1153(b)(1)(A). To demonstrate extraordinary ability, the applicant must either provide evidence of a one-time achievement such as a Pulitzer Prize, Oscar, or Olympic Medal, or evidence that they meet three of the following ten criteria: (1) received lesser nationally or internationally recognized prizes or awards for excellence; (2) obtained membership in associations in the field which demand outstanding achievement of their members; (3) had material about the applicant published in professional or major trade publications or other major media; (4) been asked to judge the work of others, either individually or on a panel; (5) made original scientific, scholarly, artistic, athletic, or business-related contributions of major significance to the field; (6) authored scholarly articles in professional or major trade publications or other major media; (7) created work that has been displayed at artistic exhibitions or showcases; (8) performed a leading or critical role in distinguished organizations; (9) commanded a high salary or other significantly high remuneration in relation to others in the field; (10) achieved commercial successes in the performing arts. *See* 8 C.F.R. § 204.5(h)(3)(i)(x); USCIS Policy Manual, Volume 6, Part F, Chapter 2, *available at* https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-2.

49.     An EB-1A visa does not require a labor certification or an existing job offer in the United States. *Compare* 8 U.S.C. § 1153(b)(1) *with* 8 U.S.C. § 1153(b)(2)(A) and 8 U.S.C. § 1153(b)(3)(C).

50.     Congress also created the EB-2 visa category, which is reserved for members of the professions holding an advanced degree or its equivalent, or a person who (1) has exceptional ability in the sciences, arts, or business, (2) will substantially benefit the national economy, cultural

14

or educational interests, or welfare of the United States, and (3) whose services in the sciences, arts, professions, or business are sought by an employer in the United States. 8 U.S.C. § 1153(b)(2)(A). To demonstrate exceptional ability, an applicant must submit evidence satisfying three of the following six criteria: (1) achieved an official academic record showing that the applicant has a degree, diploma, certificate, or similar award from a college, university, school, or other institution of learning relating to the area of exceptional ability; (2) provided evidence in the form of letter(s) from current or former employer(s) showing that the applicant has at least 10 years of full-time experience in the occupation in which he or she is being sought; (3) obtained a license to practice the profession or certification for a particular profession or occupation; (4) commanded a salary or other remuneration for services that demonstrates exceptional ability relative to others working in the field; (5) obtained membership in professional associations; and (6) been recognized for achievements and significant contributions to the industry or field by peers, governmental entities, or professional or business organizations. 8 C.F.R. § 204.5(k)(3)(ii).

51.    Congress authorized EB-2 applicants to seek a national interest waiver ("NIW"), exempting them from the job-offer and labor-certification requirements where a waiver would be in the national interest. 8 U.S.C. § 1153(b)(2)(B)(1); 8 C.F.R. § 204.5(k)(4)(ii). To grant an NIW, USCIS must find that (1) the applicant's proposed endeavor has both substantial merit and national importance; (2) the applicant is well positioned to advance the proposed endeavor; and (3) it would be beneficial to the United States to waive the job-offer and labor-certification requirements. USCIS Policy Manual, Volume 6, Part F, Chapter 5, Section D.[3] "[M]erit may be established without immediate or quantifiable economic impact" and "endeavors related to research, pure science, and the furtherance of human knowledge may qualify, whether or not the potential

---

[3] Available at: https://www.uscis.gov/policy-manual/volume-6-part-f-chapter-5#S-D.

accomplishments in those fields are likely to translate into economic benefits for the United States." *Id.* If the applicant's proposed endeavor has the "significant potential to broadly enhance societal welfare or cultural or artistic enrichment, or to contribute to the advancement of a valuable technology or field of study, it may rise to the level of national importance." *Id.* Congress required individualized, merits-based assessments of an applicant's ability and the national value of the applicant's work in order to grant an NIW.

52.    USCIS articulated the controlling framework for granting NIWs in a precedential decision, *Matter of Dhanasar*, 26 I. & N. Dec. 884 (AAO 2016), which requires an individualized showing that (1) the applicant's proposed endeavor has substantial merit and national importance; (2) the applicant is well positioned to advance the proposed endeavor; and (3) on balance, it would benefit the United States to waive the job-offer and labor-certification requirements.

53.    To encourage entrepreneurship and investment in the United States, Congress separately created the EB-5 immigrant investor category. 8 U.S.C. § 1153(b)(5).

54.    The EB-5 visa is available only to qualified immigrants who invest approximately $1 million in a new commercial enterprise for not less than 2 years and create at least 10 full-time jobs for United States workers within two years of the investment. 8 U.S.C. § 1153(b)(5)(A)(ii), (C)(i). The noncitizen must make a minimum qualifying investment of $1,050,000 (or $800,000, if the investment is made in a Targeted Employment Area—a rural area or one with high unemployment as designated consistent with statute 8 U.S.C. § 1153(b)(5)(B)). *See* 8 U.S.C. § 1153(b)(5)(A), (B). This requirement can be met either through a direct investment in a business or through a regional center.

55.    The INA authorizes approximately 10,000 visas each fiscal year for immigrant investors (including their spouses and unmarried children under the age of 21). *See* 8 U.S.C.

§ 1153(b)(5)(A) (making visas available "in a number not to exceed 7.1 percent of such worldwide level").

56.     The law requires that the visas available each fiscal year in the EB-5 category be divided and reserved for separate types of investments. *See* 8 U.S.C. § 1153(b)(5)(B)(i). Of the visas made available within this category in each fiscal year, the law requires that 20 percent must be reserved for "qualified immigrants who invest in a rural area," 10 percent for "qualified immigrants who invest in an area designated by the Secretary of Homeland Security under clause (ii) as a high unemployment area," and 2 percent for "qualified immigrants who invest in infrastructure projects." *Id*. § 1153(b)(5)(B)(i)(I). The law requires that any unused visas in any of the three categories be carried over for use in the same category the following fiscal year. *Id.*

57.     The law requires that the approved noncitizen investor be initially awarded only conditional permanent residence to enter the United States for the project. *See* 8 U.S.C. § 1186(b).  After two years, the noncitizen may apply to remove the conditions, which requires the noncitizen to demonstrate that the investment met the requirement of creating at least 10 full-time jobs. 8 U.S.C. § 1153(b)(5)(M)(iv). Thus, when Congress chose to link immigration benefits to capital investment in the United States, it did so expressly, with defined eligibility criteria, statutory safeguards, and a specific numerical allocation for different types of investments.

### B.     *Annual Visa Caps, Priority Dates, and the Visa Bulletin*

58.     Congress set annual numerical caps on available employment-based visas. 8 U.S.C. § 1151(d). By statute, the maximum number of employment-based visas that can be issued each year is 140,000. 8 U.S.C. § 1151(d)(1). The statute also specifies the circumstances in which the number may be raised for a particular year. 8 U.S.C. § 1151(d)(1)(B), (2)(C).

59.     The statute specifies a "preference allocation" for employment-based visas, with

limits on the number of visas that can be granted in each preference category. 8 U.S.C. § 1153(b). EB-1 visas are the first preference category and make up 28.6 percent of the employment-based worldwide level determined under the INA's statutory formula for the fiscal year, plus any numbers not required for EB-4 and EB-5 visas. 8 U.S.C. § 1153(b)(1). EB-2 visas, whether granted with an NIW or not, are the second preference category and also make up 28.6 percent of the set worldwide number of employment-based immigrant visas, plus any numbers not required for EB-1 visas. 8 U.S.C. § 1153(b)(2). In light of the annual cap on employment-based visas, roughly 40,000 EB-1 and 40,000 EB-2 employment-based visas are available worldwide each year.

60.     The statute also sets a per-country limit for employment-based visas, which is 7 percent of the total annual family-sponsored and employment-based preference limits, *i.e.*, 25,620 available visas per fiscal year. 8 U.S.C. § 1152(a). The dependent area (territory governed by a sovereign state) limit is set at 2%, or 7,320 visas per fiscal year. *Id.*

61.     The statute requires employment-based preference visas to be issued in the order in which the application of a qualified applicant was filed. Spouses and children are entitled to the same status, and the same order of consideration, if accompanying or following to join the principal applicant. 8 U.S.C. § 1153(d), (e).

62.     Applicants for EB-1 and EB-2 visas, like those for all preference categories, are assigned what is known as a priority date, which is the date on which the underlying petition (and, where applicable, the labor certification) was filed. 8 U.S.C. § 1153(e)(1); 8 C.F.R. § 204.5(d).

63.     The State Department issues a monthly publication, known as the "Visa Bulletin," which states when immigrant visas are available for family-sponsored and employment-based

applicants, indicating cut-off dates for different preference categories.[4] The Visa Bulletin allows applicants to determine when they can apply for an immigrant visa abroad or apply to adjust status in the United States. The bulletin lists "Final Action Dates" (indicating when a visa may be issued or adjustment approved) and "Dates for Filing" (indicating when applicants may file their visa or adjustment paperwork), allowing applicants to track their progress based on their priority date.

64.    The number of qualified EB-1 and EB-2 visa applicants invariably exceeds the number of available visas, creating a backlog that varies by country. For example, the State Department's latest Visa Bulletin indicates that the EB-1 category is backlogged to February 1, 2023, for both China and India, meaning that qualified applicants from those countries who applied on February 1, 2023, or later are still waiting for their visas to be issued. The EB-2 category is backlogged to September 1, 2021, for China (mainland-born); July 15, 2013, for India; and April 1, 2024, for Mexico and the Philippines. *Id.* All other chargeability areas—including Colombia, Ghana, and Taiwan—are likewise backlogged to April 1, 2024.

65.    The system set forth in the statute ensures that access to permanent residence turns on statutory eligibility and filing priority; the statute does not provide a mechanism for preferential treatment based on ability to pay. Given the statutory cap and the persistent backlog, expanding the pool of applicants deemed "eligible" for EB-1 and EB-2 visas—and expediting some based on a large payment—necessarily delays adjudication of qualified applicants and causes some to miss out on visas they otherwise would have received.

### C.    *Adjudication and Processing Fees*

66.    The INA established a detailed framework governing immigration-adjudication

---

[4] *See, e.g., U.S. Visa Law & Policy,* U.S. State Department, https://travel.state.gov/content/travel/en/legal/visa-law0.html.

fees, designating Defendants USCIS and State Department as the responsible agencies.

67.    The statute expressly limits Defendant DHS's authority to set adjudication fees to those that recover the full costs of providing services and associated administrative costs. 8 U.S.C. § 1356(m). Pursuant to this authority, Defendant DHS has historically set visa adjudication fees through notice-and-comment rulemaking, justifying fee increases based on cost recovery. *See, e.g.*, U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 Fed. Reg. 402 (Jan. 4, 2023).

68.    To ensure that its filing fees accurately recover the full costs of providing the services rendered, pursuant to the Chief Financial Officers Act ("CFO Act"), Defendant USCIS reviews the fees it charges every two years. 31 U.S.C. § 902(a)(8).

69.    The fees prescribed in the regulations that are not set or limited by statute may be adjusted for inflation, but not more than once per year, and only by publication of a rule in the Federal Register. 8 C.F.R. § 106.2(d).

70.    In the 2020 Emergency Stopgap USCIS Stabilization Act ("USCIS Stabilization Act"), Congress authorized Defendant USCIS to establish and collect premium processing fees, *i.e.*, additional fees for expedited processing for certain immigration benefit types. Pub. L. No. 116-159, § 4102, 134 Stat. 739 (2020); 8 U.S.C. § 1356(u). The USCIS Stabilization Act authorized Defendant DHS to adjust premium processing fees on a biennial basis to keep pace with inflation. 8 U.S.C. § 1356(u)(3)(C). The premium processing fee, which is currently $2,805 for employment-based petitions, is an optional fee that an applicant can pay to expedite Defendant USCIS's decision on a visa application. On January 12, 2026, Defendant DHS published a final rule that will increase Defendant USCIS fees for premium processing to reflect inflation from June 2023 through June 2025. Adjustment to Premium Processing Fees, 91 Fed. Reg. 1059 (Jan. 12,

2026).

71.    Defendant USCIS's current fee schedule sets the fee for adjudicating a Form I-140 Immigrant Petition for Alien Workers at $715 if a paper application is filed, or $665 if the application is filed online. Additional fees may apply and are listed on the fee schedule.[5]

72.    No statute authorizes Defendants to create a payment-linked eligibility or expedited-processing framework for EB-1 or EB-2 visas, much less to set and collect a processing fee for it.

### D.    Congressional Authority to Raise Revenue

73.     Under Article I, Section 7, Clause 1 of the U.S. Constitution, Congress has the exclusive authority to raise revenue. *See also id.* § 8, cl. 1 (taxing and spending clause).

74.    Under 15 U.S.C. § 1522, Defendant Secretary of Commerce is authorized to accept "gifts." Section 1522 provides: "The Secretary of Commerce is hereby authorized to accept, hold, administer, and utilize gifts and bequests of property, both real and personal, for the purpose of aiding or facilitating the work of the Department of Commerce."

75.    Payments made in exchange for benefits are not gifts. The Office of Privacy and Open Government's Directive 203-9 on Gifts and Bequests (Oct. 26, 2009), which expressly governs gifts that may be accepted under 15 U.S.C. § 1522,  provides: "A gift or bequest may be accepted by an authorized official only if the donation would . . . [c]onstitute a bona fide gift or bequest rather than a payment in exchange for goods or services (*e.g.*, the donor has not expressly or impliedly requested some particular Department action which directly benefits the donor in return for the gift or bequest (i.e., a quid pro quo))."[6]

---

[5] Available at: https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf.
[6] Available at:  https://www.commerce.gov/opog/directives/DAO_203-9.

76.     In short, any payment made in exchange for expedited adjudication or preferential access to visas—to the extent such treatment is lawful—must be authorized by Congress.

## II.     Factual Background

### A.     President Trump Creates the Gold Card Program via Executive Order.

77.     On September 19, 2025, President Trump issued an Executive Order titled "The Gold Card." Executive Order 14351, *The Gold Card*, 90 Fed. Reg. 46031 (the "EO").[7] The EO's stated purpose is to "end[ ] illegal immigration and prioritiz[e] the admission of aliens who will affirmatively benefit the Nation, including successful entrepreneurs, investors, and businessmen and women." EO § 1.

78.     In the EO, the President "announce[d] the Gold Card, a Visa Program overseen by the Secretary of Commerce that will facilitate the entry of aliens who have demonstrated their ability and desire to advance the interests of the United States by voluntarily providing a significant financial gift to the Nation." *Id.*

79.     The EO directs Defendant Secretaries of the Departments of Commerce, State, and DHS to establish a Gold Card program authorizing a noncitizen who makes an unrestricted "gift" to Defendant Commerce Department pursuant to 15 U.S.C. § 1522 "to establish eligibility for an immigrant visa using an expedited process." EO § 2.

80.     The EO directs that the minimum required payment to qualify a noncitizen for the Gold Card be set at $1 million for an individual and $2 million for a corporation or "similar entity" making the payment on behalf of an individual. EO § 2(a).

81.     The EO requires that individuals who make the required payment be considered eligible for EB-1A and EB-2 visas and for an NIW. EO § 2(b).

---

[7] Available at: https://www.whitehouse.gov/presidential-actions/2025/09/the-gold-card/.

82.    The EO states:

In adjudicating visa applications, the Secretary of State and the Secretary of Homeland Security shall, consistent with applicable law, treat the gift specified in subsection (a) of this section as evidence of eligibility under 8 U.S.C. § 1153(b)(1)(A), of exceptional business ability and national benefit under 8 U.S.C. § 1153(b)(2)(A), and of eligibility for a national-interest waiver under 8 U.S.C. § 1153(b)(2)(B).

*Id.*

83.    By directing Defendants to treat payment as "evidence of eligibility," the EO directs Defendants to substitute a monetary contribution for the individualized, merits-based assessments Congress required for EB-1A, EB-2, and NIW adjudications, and to create a payment-linked expedited processing track that diverts adjudicatory resources from consideration of qualified applicants.

84.    The EO directs Defendants to "[e]stablish a process for application and expedited adjudication of Gold Card petitions, visa issuance, and adjustment of status." EO § 3(a).

85.    The EO directs Defendants to specify the date on which applicants or sponsors may begin to make payments to obtain consideration of applications under the Gold Card program. EO § 3(b).

86.    The Executive Office of the President issued a Fact Sheet concerning the EO stating "[t]he Order instructs that these gifts serve as evidence of exceptional business ability and national benefit."[8]

87.    After issuing the EO, President Trump publicly stated that the program would involve a set "price" for a card conferring "green card privileges" and paving "a route to citizenship." The President also declared that "wealthy people" would obtain immigration benefits

---

[8] Available at: https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-launches-the-gold-card-program/.

by purchasing access.[9]

**B.    Defendants Create the Gold Card Program.**

88.    Following the EO, Defendant Secretaries of State, Homeland Security, and Commerce established and implemented the Gold Card program, treating a payment to Defendant Commerce Department as evidence of statutory eligibility for EB-1 and EB-2 visas and an NIW, and guaranteeing expedited processing for people who make the payment.

89.    Defendant USCIS's establishment of the Gold Card program included creation of a new petition form, Form I-140G, and its instructions for how to apply for a Gold Card, thereby altering the substantive and procedural requirements for seeking EB-1A and EB-2 visas and NIWs.[10]

90.    On or about December 10, 2025, Defendants announced that Defendant Commerce Department was accepting payments, and that Defendant DHS was accepting applications under the Gold Card program through a jointly administered website ("The Trump Gold Card is Here. Unlock life in America."). *See* https://trumpcard.gov/.

91.    Defendants' joint website promises that applicants who pay the processing fee are entitled to "Special Benefits"—making such assurances as that "the process for petition approval and visa adjudications will take place on an expedited basis," "the process should take weeks," and applicants will "receive U.S. residency in record time" "as an EB-1 or EB-2 visa holder." The website thus reflects that payment is not a gift, but a *quid pro quo* for accelerated adjudication and preferential processing.

---

[9] Williams & Blackburn, *Trump says US will sell $5 million 'gold card' to wealthy foreigners*, CNN (Feb. 25, 2025) https://www.cnn.com/2025/02/25/politics/us-gold-card-foreigners-trump/index.html.

[10] Available at: https://www.uscis.gov/sites/default/files/document/forms/I-140G.pdf.

92.     The website states that Defendants set the processing fee for applications under the Gold Card program at $15,000.

93.     Defendants' creation and implementation of the Gold Card program—specifically, their decision to treat a payment as evidence of statutory eligibility, their creation of an expedited process for considering applications from individuals who make the payment, and their establishment of a $15,000 processing fee—constitute final agency action.

94.     None of the foregoing actions creating and implementing the Gold Card program were preceded by a notice of proposed rulemaking or an opportunity for public comment.

### C.     *The Gold Card Visas Go on Sale*

95.     President Trump has publicly claimed that over $1 billion worth of Gold Cards have been "sold."[11]

96.     Defendant Secretary Lutnick has publicly boasted that he "sold" 1,000 Gold Cards in a single day and that applicants simply need to pay a large sum of money to "have the right to be in America."[12]

97.     Defendant Secretary Lutnick has stated that if the Administration were to "sell 10 million of the cards, that [would be] a total of $50 trillion." To that, President Trump added, "We have $35 trillion in debt. That'll be nice."[13]

---

[11] *Trump claims over $1 billion in immigration "gold cards" have been sold*, SCRIPPS NEWS (Dec. 19, 2025), https://www.scrippsnews.com/politics/immigration/trump-claims-over-1-billion-in-immigration-gold-cards-have-been-sold.

[12] https://www.youtube.com/watch?v=182ckTL2KBA&t=4286s.

[13] Aimee Picchi, *Trump proposes offering $5 million "gold card" to wealthy immigrants. Here's how it would* work, CBS News (Mar. 5, 2025), https://www.cbsnews.com/news/trump-gold-card-eb5-visa-5-million-immigration-oligarch-cbs-news-explains/.

**D.** **_Defendants Are Using the Gold Card Program as an Unauthorized Substitute for_**
**_EB-5 Visas._**

98.    Defendant Secretary Lutnick has stated, "[W]e're going to end the EB-5 program
. . . . We're going to replace it with the Trump Gold Card, which is really a Green Card Gold."[14]

99.    The EO and Defendants' creation and implementation of the Gold Card program
allows applicants who pay $1 or 2 million to circumvent Congress's specific requirements and
safeguards for investment-based immigration—embodied in the statutory EB-5 framework—and
instead obtain permanent residence through a competing, non-statutory scheme.

100.    Defendants' decision to route payment-based applicants through EB-1A and EB-
2—rather than the statutorily designed EB-5 pathway—is inconsistent with the INA and
Congress's intent.

**E.** **_Plaintiffs Will Be Harmed by the Gold Card Program._**

101.    The EO and Defendants' creation and implementation of the Gold Card program
expands the pool of applicants eligible for EB-1A and EB-2 visas and NIWs to include individuals
who do not meet the statutory and regulatory criteria for those merits-based visas.

102.    The EO and Defendants' creation and implementation of the Gold Card program
allows applicants to pay to purchase expedited adjudication, shrinking processing times from years
to weeks and ensuring Gold Card applicants will be considered before eligible EB-1A, EB-2, or
NIW applicants and their families.

103.    The EO and Defendants' creation and implementation of the Gold Card program
displaces qualified EB-1A, EB-2, or NIW applicants and their families because Defendants will
prioritize Gold Card applications, and every employment-based visa issued to a Gold Card

---

[14] _Id._

recipient is one fewer that remains available to other applicants under strict annual caps.

104.    The creation and implementation of the Gold Card program is causing injury to Plaintiff AAUP and its members by prolonging reliance on temporary status, increasing employment instability, and disrupting research, teaching, and professional advancement, as thousands of individuals, according to President Trump and Defendant Secretary Lutnick, have already applied for the Gold Card and will be given preferential treatment for a limited number of visas over qualified professionals. As meritorious, high-skilled applicants face longer waits and heightened status uncertainty, Plaintiff AAUP faces an increased risk of losing members who cannot renew or extend work authorization in time, must abandon U.S.-based positions and training opportunities and leave the United States, or find themselves unable to enter the United States at all.

105.    The creation and implementation of the Gold Card program is causing injury to Plaintiff AAUP and its members by preventing United States universities from being able to hire and retain the most talented individuals in the world through the EB-1 and EB-2 visa categories established by statute.

106.    The creation and implementation of the Gold Card program is causing injury to the individual Plaintiffs and other accomplished employment-based applicants who have filed or will file petitions in the EB-1A and EB-2 categories, including Plaintiff AAUP's members. Those individuals have invested substantial time and resources to satisfy Congress's statutory criteria, have priority dates that determine their place in line under 8 U.S.C. § 1153(e), and are seeking a limited number of visas and NIWs within capped preference categories. By treating payment to Defendant Commerce Department as a basis to grant EB-1 or EB-2 visas, including NIWs, and expediting those payment-based petitions, Defendants' creation and implementation of the Gold

Card program will slow the advancement of cut-off dates, extend waits for decisions, and reduce visa availability for qualified applicants. Such delay and displacement will inflict concrete professional and personal harms on the individual Plaintiffs, including prolonged family separation, delayed career progress, and increased risk of losing lawful status or employment authorization.

## CLAIMS FOR RELIEF

### COUNT I AGAINST ALL DEFENDANTS
### Agency Action Contrary to Law and in Excess of Statutory Authority
### (APA, 5 U.S.C. § 706(2)(A), (C)):
### The Gold Card program operates in violation of 8 U.S.C. § 1153(b)(1)(A)

107.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

108.    The APA requires courts to hold unlawful and set aside agency action that is not in accordance with law or is in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(A), (C).

109.    The INA does not authorize Defendants to find applicants eligible for an EB-1A immigrant visa based on a payment to Defendant Commerce Department, to treat such payment as a substitute for or relevant to the showings of extraordinary ability required by statute and regulation, or to condition or accelerate EB-1A adjudication based on such payment.

110.    Defendants are deeming applicants eligible for an EB-1A immigrant visa based on a payment to Defendant Commerce Department, treating such payment as a substitute for or relevant to the showings of extraordinary ability required by statute and regulation, and conditioning or accelerating EB-1A adjudication based on such payment contrary to the INA and applicable regulations and in excess of statutory authority.

111.    Because Defendants' creation and implementation of the Gold Card program is

28

contrary to the INA and applicable regulations and in excess of statutory authority, it is unlawful and must be set aside. 5 U.S.C. § 706(2)(A), (C).

## COUNT II AGAINST ALL DEFENDANTS
### Agency Action Contrary to Law and in Excess of Statutory Authority
### (APA, 5 U.S.C. § 706(2)(A), (C)):
### The Gold Card program operates in violation of 8 U.S.C. § 1153(b)(2)

112.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

113.    The APA requires courts to hold unlawful and set aside agency action that is not in accordance with law or is in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(A), (C).

114.    The INA does not authorize Defendants to find applicants eligible for an EB-2 immigrant visa or NIW based on a payment to Defendant Commerce Department, to treat such payment as a substitute for or relevant to the showings of exceptional ability required by statute and regulation, or to condition or accelerate EB-2 or NIW adjudication based on such payment.

115.    Defendants are deeming applicants eligible for an EB-2 immigrant visa and a NIW based on a payment to Defendant Commerce Department, treating such payment as a substitute for or relevant to the showings of exceptional ability required by statute and regulation, and conditioning or accelerating EB-2 and NIW adjudication based on such payment contrary to the INA and applicable regulations and in excess of statutory authority.

116.    Defendants' creation and implementation of the Gold Card program is contrary to the INA and in excess of statutory authority.

**COUNT III AGAINST ALL DEFENDANTS**
**Agency Action Contrary to Law and in Excess of Statutory Authority**
**(APA, 5 U.S.C. § 706(2)(A), (C)):**
**The Gold Card program operates in violation of 8 U.S.C. § 1153(b)(5)**

117.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

118.    The APA requires courts to hold unlawful and set aside agency action that is not in accordance with law or is in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(A), (C).

119.    The INA does not authorize Defendants to grant employment-based immigrant visas based on any form of monetary payment to or investment in the United States without finding that the statutory and regulatory criteria for an investor visa under the EB-5 are satisfied.

120.    Defendants' creation and implementation of the Gold Card program is contrary to the INA and in excess of statutory authority.

**COUNT IV AGAINST DEFENDANT COMMERCE DEPARTMENT**
**Agency Action Contrary to Law and in Excess of Statutory Authority**
**(APA, 5 U.S.C. § 706(2)(A), (C)):**
**The Gold Card program operates in violation of 15 U.S.C. § 1522**

121.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

122.    The APA requires courts to hold unlawful and set aside agency action that is not in accordance with law or is in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(A), (C).

123.    Defendant Commerce Department cannot lawfully accept money as a *quid pro quo* for expedited processing, preferential treatment, or any other advantage for applicants for visas. 15 U.S.C. § 1522.

124.    Defendant Commerce Department's solicitation and acceptance of payments under

the Gold Card program is contrary to law and in excess of statutory authority.

## COUNT V AGAINST ALL DEFENDANTS
### Agency Action Arbitrary, Capricious, or Contrary to Law
### (APA, 5 U.S.C. § 706(2)(A))

125.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

126.    The APA requires courts to hold unlawful and set aside agency action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

127.    Defendants failed to articulate a satisfactory explanation for the creation and implementation of the Gold Card program, including a reasoned analysis of the substantial changes of agency rules and policies the Gold Card program affected. Defendants failed to consider and address the reliance interests of noncitizens who have applied for or are in the process of applying for EB-1A or EB-2 visas or NIWs based on the statutory and regulatory eligibility requirements and procedures.

128.    Defendants' creation and implementation of the Gold Card program is arbitrary and capricious, and contrary to Defendants' regulations.

## COUNT VI AGAINST ALL DEFENDANTS
### Failure to Engage in Required Notice-and-Comment Rulemaking
### (APA, 5 U.S.C. §§ 553, 706(2)(D))

129.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

130.    The APA requires notice-and-comment rulemaking for legislative rules. 5 U.S.C. § 553.

131.    Defendants' decisions implementing a Gold Card program—including but not limited to the decision to treat a payment to Defendant Commerce Department as evidence relevant

31

to eligibility for EB-1 and EB-2 visas and an NIW, the establishment of the $15,000 application fee, and the provision of expedited consideration of applications—are legislative rules.

132.    Defendants implemented those rules without publishing a notice of proposed rulemaking, without providing the public a meaningful opportunity to comment, and without issuing a final rule adopted through the procedures required by 5 U.S.C. § 553.

133.    Defendants' creation and implementation of the Gold Card program is therefore unlawful and must be set aside.

**COUNT VII AGAINST ALL DEFENDANTS**
***Ultra Vires* Agency Action**

134.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

135.    To the extent that the Gold Card program, or any portion thereof, is not reviewable under the APA, this Court retains equitable authority to enjoin federal officers from acting beyond their lawful authority.

136.    Defendants lack statutory and constitutional authority to create and implement the Gold Card program.

137.    No statute authorizes Defendants to treat a payment to Defendant Commerce Department as "evidence of eligibility" for an EB-1A or EB-2 visa or an NIW, or to make that payment the operative trigger for expedited adjudication or preferential treatment of applications.

138.    No statute authorizes Defendants to raise revenue by soliciting payments in return for treating the payment as "evidence of eligibility" for an EB-1A or EB-2 visa or an NIW and the operative trigger for expedited adjudication or preferential treatment of the payor's application.

139.    Plaintiffs have no adequate remedy at law for *ultra vires* action not subject to APA review, and equitable relief is necessary to prevent ongoing and imminent injury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.      Declare that Defendants' challenged final agency actions—including the establishment and administration of the Gold Card program through Form I-140G and its instructions, the imposition of a nonrefundable $15,000 processing fee, and Defendants' directive and related guidance and procedures treating payment to Defendant Commerce Department as "evidence of eligibility" for EB-1A, EB-2, and NIW adjudications—exceed statutory authority and conflict with Congress's expressed will, and are therefore unlawful under the APA and *ultra* vires;

B.      Pursuant to the APA, hold unlawful and set aside the challenged final agency actions, including the establishment and administration of the Gold Card program through Form I-140G and its instructions, the imposition of a nonrefundable $15,000 processing fee, and Defendants' directive and related guidance and procedures treating payment to Defendant Commerce Department as "evidence of eligibility" for EB-1A, EB-2, and NIW adjudications;

C.      Order Defendants to rescind or withdraw the vacated instruments and to cease using them in adjudicating EB-1A and EB-2 petitions, NIW requests, visa issuance, or adjustment of status absent statutory authorization and procedures required by law;

D.      Enjoin Defendants from further implementation of the Gold Card program through the vacated instruments and procedures;

E.      Award Plaintiffs their reasonable attorney's fees and costs to the extent authorized by law;

F.      Grant such other and further relief as the Court deems just and proper.

Dated: February 3, 2026

*(signature page to follow)*

Respectfully submitted,

*/s/ Harold Craig Becker*
HAROLD CRAIG BECKER
 (D.C. Bar No. 371239)
NORMAN L. EISEN
 (D.C. Bar No. 435051)
STEPHEN A. JONAS
 (D.C. Bar No. 90037069)
BRIAN C. WARD
 (*pro hac vice* forthcoming)
LINDSAY W. ZIMLIKI
 (D.C. Bar No. 475890)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
craig@democracydefenders.org
ALLISON M. ZIEVE (D.C. Bar. No. 424786)
ADAM R. PULVER (D.C. Bar No. 1020475)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
202-588-1000
azieve@citizen.org

*Attorneys for Plaintiffs*

SARAH S. WILSON
(*pro hac vice* forthcoming)
DAVID KIM
(*pro hac vice* forthcoming)
COLOMBO HURD PL
301 E. Pine Street #450
Orlando, Florida 32801
(407) 478-1111
swilson@colombohurd.com