**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, *et al.*, | |
| *Plaintiff*, | Civil Action No. 1:26-cv-0300 (RJL) |
| vs. | |
| DEPARTMENT OF HOMELAND SECURITY, *et al.,* | |
| *Defendants*. | |

**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**AND MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

BACKGROUND ............................................................................................................................. 3

    I.    Visa Availability. ............................................................................................................. 3

    II.    Visa Processing and Adjudication. ................................................................................. 6

    III.    The Gold Card Program ................................................................................................. 7

    IV.    Plaintiffs and This Litigation. ......................................................................................... 9

LEGAL STANDARD ................................................................................................................... 10

ARGUMENT ................................................................................................................................ 11

    I.    Article III requires a concrete injury fairly traceable to the challenged action. .............. 13

    II.    Plaintiffs' "displacement" theory does not satisfy Article III. .......................................... 14

    III.    Plaintiffs' "delay" theory does not satisfy Article III. ...................................................... 16

    IV.    Because all Plaintiffs lack standing, the case must be dismissed. ..................................... 23

CONCLUSION ............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Adebayo v. U.S. Dep't of State*,
No. 24-CV-2523 (LDH), 2025 WL 964096 (E.D.N.Y. Mar. 31, 2025) ................................... 18

*Afshan v. U.S. Dep't of State*,
No. 24-CV-3397 (APM), 2026 WL 538907 (D.D.C. Feb. 26, 2026) ..................................... 18

*Almakalani v. McAleenan*,
527 F. Supp. 3d 205 (E.D.N.Y. 2021) ................................................................................ 18

*Am. Anti-Vivisection Soc'y v. USDA*,
946 F.3d 615 (D.C. Cir. 2020) ............................................................................................ 14

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
659 F.3d 13 (D.C. Cir. 2011) .............................................................................................. 14

*Artis v. Greenspan*,
223 F. Supp. 2d 149 (D.D.C. 2002) .....................................................................................11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 23

*Californians for Renewable Energy v. Dep't of Energy*,
860 F. Supp. 2d 44 (D.D.C. 2012) ...................................................................................... 24

*Dean v. DHS*,
No. CV 21-2002 (CKK), 2022 WL 2785967 (D.D.C. July 15, 2022) ................................. 18

*DHS v. Thuraissigiam*,
591 U.S. 103 (2020) ........................................................................................................... 18

*Doe v. OPM*,
813 F. Supp. 3d 156 (D.D.C. 2025) .................................................................................... 10

*Echeverri v. USCIS*,
No. 23-CV-21711-RAR, 2023 WL 5350810 (S.D. Fla. Aug. 21, 2023) ................................ 18

*El-Bey v. Mead*,
No. 1:21-cv-01184 (TNM), 2021 WL 4963550 (D.D.C. Oct. 26, 2021) .................................11

*Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.*,
892 F.3d 1249 (D.C. Cir. 2018) .......................................................................................... 13

*Entergy Ark., LLC v. FERC*,
    134 F.4th 576 (D.C. Cir. 2025) .................................................................. 13, 15

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................ 14

*Freedom Watch, Inc. v. McAleenan*,
    442 F. Supp. 3d 180 (D.D.C. 2020) ................................................................ 23

*Friends of Tilden Park, Inc. v. District of Columbia*,
    806 A.2d 1201 (D.C. 2002) .............................................................................. 14

*Green Oceans v. Dep't of the Interior*,
    No. 1:24-cv-141, 2025 WL 973540 (D.D.C. Apr. 1, 2025) ............................. 23

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................................................ 14

*Khan v. Bitter*,
    No. 23-cv-1576 (BAH), 2024 WL 756643 (D.D.C. Feb. 23, 2024) ................. 18

*\*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................ 10, 13, 23

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ........................................................................ 13

*Noble v. District of Columbia*,
    685 F. Supp. 3d 1 (D.D.C. 2023) .................................................................... 23

*\*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007) .................................................. 13, 15, 17, 20, 24

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) .................................................................................... 13, 14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................................ 10

*Taj v. U.S. Dep't of State*,
    No. CV 22-1087 (RDM), 2022 WL 17250302 (D.D.C. Nov. 28, 2022) ............ 18

*Tanner-Brown v. Jewell*,
    153 F. Supp. 3d 102 (D.D.C. 2016) .................................................................. 11

*Timbisha Shoshone Tribe v. Salazar*,
    678 F.3d 935 (D.C. Cir. 2012) .......................................................................... 11

iv

*U.S. Chamber of Com. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) ................................................................ 23, 24

*W. Wood Preservers Inst. v. McHugh*,
  925 F. Supp. 2d 63 (D.D.C. 2013) ................................................................ 23

*W. Wood Preservers Inst. v. McHugh*,
  292 F.R.D. 145 (D.D.C. 2013) .............................................................. 23, 24

*Warth v. Seldin*,
  422 U.S. 490 (1975) .......................................................................................... 13

**Statutes**

8 U.S.C. § 1151 ......................................................................................................... 3

8 U.S.C. § 1151(d) .................................................................................................... 3

8 U.S.C. § 1152 ......................................................................................................... 3

8 U.S.C. § 1152(a)(2) ............................................................................................... 5

8 U.S.C. § 1152(a)(3) ............................................................................................... 6

8 U.S.C. § 1152(a)(5)(A) .......................................................................................... 6

8 U.S.C. § 1152(b) .................................................................................................... 5

8 U.S.C. § 1153 ......................................................................................................... 3

8 U.S.C. § 1153(b) ................................................................................................. 4, 9

8 U.S.C. § 1153(b)(1)(A) .......................................................................................... 4

8 U.S.C. § 1153(b)(2)(A) .......................................................................................... 5

8 U.S.C. § 1153(b)(2)(B) ..................................................................................... 5, 22

8 U.S.C. § 1153(e) .................................................................................................... 6

8 U.S.C. § 1182(a)(5) ............................................................................................... 5

**Rules**

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 10, 25

**Regulatory Materials**

8 CFR § 1.2 ............................................................................................................... 5

v

8 C.F.R. § 204.5(d)............................................................................................................ 6, 22

22 C.F.R. § 42.51 .................................................................................................................. 6

22 C.F.R. § 42.55 .................................................................................................................. 6

Executive Order 14351, 90 Fed. Reg. 46031 (Sept. 19, 2025) ...................................... 1, 7

**INTRODUCTION**

In Executive Order 14351, "The Gold Card," the President directed the Secretary of Commerce, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a program that gives aliens a new means of establishing eligibility for certain employment-based ("EB") visas. The program promotes the United States's interest in lawful immigration by "prioritizing the admission of aliens who will affirmatively benefit the Nation, including successful entrepreneurs, investors, and businessmen and women." Exec. Order 14351, 90 Fed. Reg. 46031, 46031 (Sept. 19, 2025) ("EO"). Specifically, the Gold Card program recognizes a new way aliens may demonstrate eligibility for certain EB visas, "consistent with law and public safety and national security concerns." *Id.* If an alien makes a gift of $1 million (or $2 million from a corporation on behalf of an applicant), that gift is treated as evidence of the alien's extraordinary ability for one type of EB visa and as evidence of the requisite "exceptional business ability and national benefit" for another type. *Id.* In short, the Gold Card is designed to "facilitate the entry of aliens who have demonstrated their ability and desire to advance the interests of the United States by voluntarily providing a significant financial gift to the Nation." *Id.*

The benefits of the Gold Card program are clear. In addition to attracting immigrants with a proven record of accomplishments, the program allows applicants to donate a significant financial gift to promote commerce and American industry. Yet despite the Gold Card program's obvious value to both the United States and aliens who apply, Plaintiffs—a group of individual aliens in various stages of seeking EB visas (or merely preparing to do so), the American Association of University Professors ("AAUP"), and the United Automobile, Aerospace, and Agricultural Implement Workers of America, AFL-CIO ("UAW")—want to shut it down. Their

claims lack merit. But the fatal threshold problem is their lack of Article III standing. No Plaintiff has identified an imminent, concrete injury-in-fact that is traceable to the Gold Card program.

That lack of harm makes complete sense given what the program does: it provides a way for aliens to gain lawful entry *into* this country. It does not keep anyone *out* of the country. Plaintiffs are no exception: they are not being kept out or impeded in their current or actual attempts to gain admission. And Plaintiffs plainly suffer no concrete, cognizable injury when *others* are admitted into the United States under the Gold Card program.

Looking more closely at Plaintiffs' theories of harm exposes why each is insufficient for Article III injury. Plaintiffs' primary theory is that because the U.S. government makes available a limited number of EB visas, letting more people in will crowd them out. But, even setting aside the faulty assumption that a Gold Card applicant took a visa that would otherwise have gone to one of the named Plaintiffs, that theory fails for a more basic factual reason: There are now more than enough visas available within the EB-1 and EB-2 visa categories to satisfy demand in those categories from each country from which an individual Plaintiff originates. If the individual Plaintiffs can meet the requirements for EB visas, no shortage of supply stands in their way—and the Gold Card program has not changed that fact.

Nor can Plaintiffs establish standing on their secondary theory: that dedication of resources to the Gold Card program will cause delays in processing their EB visa petitions. That theory is again both too speculative and factually erroneous. The number of Gold Card petitions is just one component of the total number of EB visa petitions that Defendants process. And within USCIS, those petitions are processed internally by *different* employees, who were not previously (and would not otherwise be) processing ordinary EB-1 and EB-2 petitions. Moreover, Plaintiffs do not differentiate any alleged Gold Card delay effect from the myriad other factors, entirely unrelated

2

to the Gold Card program, that affect visa application processing times. Plaintiffs therefore cannot show any substantial risk of increased delays because of the Gold Card program.

The Gold Card program gives aliens a new way to establish eligibility for certain EB visas. This avenue does not violate any law, and Plaintiffs' contrary claims are wrong. But the Court need not reach the merits to dismiss this case, because no Plaintiff has standing to bring it.

## BACKGROUND

The Immigration and Nationality Act ("INA") establishes a preference-based system governing the number and allocation of EB and family-sponsored ("FS") visas. 8 U.S.C. §§ 1151-53. The Gold Card program does not add a new category of visa to this system. Rather, the Gold Card program provides an alternative means of establishing eligibility under the EB-1 and EB-2 preference categories through a $1-or-$2-million gift. Although Plaintiffs challenge the lawfulness of that avenue, they suffer no injury traceable to its creation.

## I.    Visa Availability.

Employment-based ("EB") visas, as the name suggests, are generally distributed based on the prospective employment of aliens, whereas family-sponsored visas are distributed to aliens with certain familial ties in the United States. *See* First Am. Compl. ¶¶ 52-54, ECF No. 32 ("FAC"). Although the Gold Card program involves EB visas, the availability of EB and FS visas are related. Specifically, a minimum of 140,000 EB visas is allotted each fiscal year, plus any remaining unused FS visas from the previous fiscal year also becoming available for EB visa issuances or adjustments of status. 8 U.S.C. § 1151(d); FAC ¶ 52. Because there were 46,000 unused FS visas

3

in Fiscal Year 2025, there are approximately 186,000 EB visas available for Fiscal Year 2026.[1] Exh. A (Parker Decl.) ¶ 5.

These EB visas are divided into five "preference categories": (EB-1) priority workers; (EB-2) workers holding advanced degrees or possessing exceptional ability; (EB-3) skilled workers, professionals, and certain other workers; (EB-4) special immigrants, including special immigrant juveniles, religious ministers, and other religious workers; and (EB-5) employment creation immigrants. *See* FAC ¶¶ 36-44, 47-48. The EB-1, EB-2, and EB-3 preference categories are each allotted 28.6% of the total number of EB visas available, and the EB-4 and EB-5 preference categories are each allotted 7.1% of the overall total. 8 U.S.C. § 1153(b); FAC ¶¶ 49-50, 53. For Fiscal Year 2026, that amounts to approximately 53,000 visas in each of the first three categories and approximately 13,000 visas in each of the latter two categories.[2]

The two categories most relevant here are EB-1A and EB-2. EB-1A visas are available to certain aliens with "extraordinary ability in the sciences, arts, education, business, or athletics," who "seek[] to enter the United States to continue work in the area of extraordinary ability," and whose entry "will substantially benefit" the United States. 8 U.S.C. § 1153(b)(1)(A); FAC ¶¶ 36-38. EB-2 visas are available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts,

---

[1] This number does not include certain unused EB-5 visas from Fiscal Years 2024 and 2025, which have carried over to Fiscal Year 2026.

[2] This number does not include certain unused EB-5 visas from Fiscal Years 2024 and 2025, which have carried over to Fiscal Year 2026. The INA also permits visas "not required" to be issued in one category to be made available in another. For example, visas that are not required in EB-1 for a given year may be made available in EB-2 instead. 8 U.S.C. § 1153(b).

professions, or business are sought by an employer in the United States." 8 U.S.C. § 1153(b)(2)(A); FAC ¶ 42. EB-2 immigrant visa petitions can sometimes be accompanied by a "National Interest Waiver" ("NIW"). 8 U.S.C. § 1153(b)(2)(B)(i); FAC ¶ 43. This waiver is used when an alien's admission is of substantial importance or national interest, and it exempts the alien seeking EB-2 immigrant classification from the job offer requirement, and consequently from the labor certification process.[3] 8 U.S.C. §§ 1153(b)(2)(B)(i), 1182(a)(5); FAC ¶ 43.

In addition to category limits, the INA creates per-country limits for certain visas. 8 U.S.C. § 1152(a)(2). This prevents any single "foreign state" from consuming all available visas. An alien's "native" foreign state is based on, with few exceptions, their country of birth. *See id.* § 1152(b). The visa is referred to as "chargeable" to that native country. *See id.* Thus, an alien born in China, seeking admission to the United States through an EB visa, would generally be chargeable to the per-country limitation for China. "[T]he total number of [EB and FS] immigrant visas made available to natives of any single foreign state or dependent area . . . in any fiscal year may not exceed 7 percent (in the case of a single foreign state) or 2 percent (in the case of a dependent area) of the total number of such visas made available . . . in that fiscal year." *Id.*

Accordingly, of the 186,000 EB visas and 226,000 FS visas made available this year (approximately 412,000 total), no more than 7% (or approximately 28,000 EB and FS visas) may

---

[3] The regulation at 8 CFR § 1.2 defines "application" as a "benefit request." That regulation also defines "benefit request" as "any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose." Thus, the terms "applicant," "petitioner," and "benefit requestor" may be used interchangeably in this context. As the definition uses the phrase "filed," the term "filer" may also be used.

be allocated to natives of a single foreign state.[4] Parker Decl. ¶ 6. These restrictions govern the availability and subsequent distribution of EB visas.

## II.    Visa Processing and Adjudication.

The INA requires EB visas, within each preference category and subject to the above per-country limitations, to be issued to eligible aliens in the order in which a completed, signed immigrant visa petition has been accepted by USCIS. 8 U.S.C. § 1153(e).[5] The date of a petition's acceptance is called a "priority date," and it determines the order in which the alien's visa, if he or she is eligible to receive one, is issued. *See* 8 C.F.R. § 204.5(d). When a foreign state exceeds the 7% limitation in a fiscal year—or if a preference category exceeds the number of visas available in a fiscal year—it is considered "oversubscribed." *See* Exh. B (Wilson Decl.) ¶¶ 11-12.

Title 8 U.S.C. §1153(e)(3) and (g), respectively, authorize the State Department to maintain "[w]aiting lists of applicants for [immigrant] visas" and to "make reasonable estimates of the anticipated numbers of [immigrant] visas to be issued . . . and to rely upon such estimates in authorizing the issuance of visas." *See also* 22 C.F.R. §§ 42.51-42.55. To do so, the State Department announces cutoff dates, by preference category and foreign state, reflecting the date on or after which new applicants cannot be currently accommodated. *See* Parker Decl. ¶ 9; Wilson Decl. ¶¶ 6-7. State makes this determination by examining all applicants, the preference category to which each applied, the foreign state to which each is chargeable, and the existing per-category and per-country limitations. Parker Decl. ¶ 10; Wilson Decl. ¶¶ 5-7. From this information, State can construct a comprehensive queue that includes estimates of all relevant visa applicants. These

---

[4] There are exceptions that can allow natives of a single foreign state to exceed this limit in certain circumstances. 8 U.S.C. § 1152(a)(3) and (5)(A).

[5] For EB-3 and some EB-2 visas, the labor certification application must first be received by the Department of Labor. 8 C.F.R. § 204.5(d).

cutoff dates are called "final action dates," and only those natives of a foreign state who are seeking that preference category of visa with a priority date *earlier* than that final action date may have their visa applications processed. *See* Parker Decl. ¶¶ 9-10.

State publishes these figures in the monthly "*Visa Bulletin*" to summarize the availability of visas under the worldwide and per-country limits for each preference category. U.S. Department of State, *The Visa Bulletin*, https://perma.cc/824M-8PX8 (last visited June 22, 2026). This publication also includes a chart of final action dates, which shows the priority dates that are eligible to receive a visa. *Id.* The current *Visa Bulletin*, published earlier this month, reflects that all countries except China and India have a status of "current" for EB-1 and EB-2 visas, meaning that "numbers are authorized for issuance to all qualified applicants." U.S. Department of State, "Visa Bulletin for July 2026," https://perma.cc/CFD7-K69Z (last visited June 24, 2026).

### III.    The Gold Card Program

The Gold Card program permits aliens to satisfy their eligibility for visas in the EB-1 and EB-2 preference categories through a monetary gift to the United States of $1 million or $2 million (if the alien is sponsored by a corporation). 90 Fed. Reg. at 46031. The program promotes the United States's interest in lawful immigration by "prioritizing the admission of aliens who will affirmatively benefit the Nation, including successful entrepreneurs, investors, and businessmen and women[,]" "consistent with law and public safety and national security concerns." *Id.* The $1 million (or $2 million) gift is treated as evidence supporting the individual's EB-1A or EB-2 application. *Id.* In short, the Gold Card is designed to "facilitate the entry of aliens who have demonstrated their ability and desire to advance the interests of the United States by voluntarily providing a significant financial gift to the Nation." *Id.*

Procedurally, the Gold Card program will not alter a petitioner's priority date. *See* Parker Decl. ¶¶ 12-14. Rather, the Gold Card petitioner will submit a Form I-140G (Immigrant Petition for the Gold Card Program) to USCIS to seek classification under either the EB-1 or EB-2 preference category. Wilson Decl. ¶ 3. As noted above, the EB-1 preference category is for aliens with extraordinary ability, and the EB-2 preference category is for aliens with exceptional ability that will substantially benefit the United States. And under E.O. 14351, the $1-or-$2-million monetary gift demonstrates evidence of that extraordinary or exceptional ability and substantial benefit to the United States. After the Gold Card applicant pays a $15,000 processing fee and properly files Form I-140G, the Gold Card applicant receives a priority date. That date will determine when the Gold Card applicant may, if otherwise eligible, be issued an immigrant visa. And because visas are adjudicated on a case-by-case basis—a variety of factors unique to individual applications dictate wait times—Gold Card applicants will not necessarily have their petitions adjudicated faster than any non-Gold-Card applicant, subject to the preference category and per-country limitations applicable to all applicants discussed above. *See* Exh. C (Selby Decl.) ¶ 12. Indeed, regardless of whether the participant filed a traditional EB-2 NIW petition on Form I-140 or used Form I-140G for the Gold Card program, "the visa availability will be identical for all applicants in the same category who have the same priority date and country of chargeability." Parker Decl. ¶ 18. Moreover, "priority date and country of chargeability of a petition do not dictate the processing time of that petition," and "[p]etitions filed by or on behalf of aliens with earlier priority dates may take longer to process than petitions with later priority dates, depending on case-specific adjudicative factors." Selby Decl. ¶ 12.

Gold Card applicants still have their petitions vetted by the Department of Homeland Security and must visit a U.S. consulate and interview with a consular officer to ensure they are

suitable for admission. Selby Decl. ¶ 7; Wilson Decl. ¶ 4. Aliens who must wait for visa availability will continue to have their immigrant visa applications processed according to their priority date and the current final action date, regardless of whether they are a Gold Card applicant. *See* Parker Decl. ¶¶ 12-14, 18. Although a Gold Card application may require less processing time because the $1-or-$2-million gift provides evidence relevant to eligibility, that does not mean that other EB-1 and EB-2 applications require more processing time than they otherwise would. In sum, the Gold Card program provides an alternative way to establish eligibility for an EB-1 and EB-2 visa by providing evidence of extraordinary or exceptional ability within the INA's statutory framework. It does not make it more difficult for other EB-1 or EB-2 applicants to receive a visa.

## IV.    Plaintiffs and This Litigation.

Plaintiffs in this case are six named individuals who allege that they have petitioned or intend to petition for an EB-1 or EB-2 visa, FAC ¶¶ 19-24; AAUP, which is a "nonprofit membership association and labor union of faculty, graduate students, and other academic professionals," *id.* ¶ 17; and UAW, which is "an unincorporated labor organization that represents approximately 120,000 workers in higher education," *id.* ¶ 18. AAUP claims many of its members are "noncitizens in United States academic and research positions who are pursuing or are eligible to pursue employment-based immigrant visas under 8 U.S.C. § 1153(b), including EB-1 and EB-2 visas." *Id.* ¶ 17. UAW alleges that many of its members "who are noncitizens holding academic and research positions in the United States under temporary visas have applied or plan to apply in the near future for employment-based immigrant visas under 8 U.S.C. § 1153(b), including EB-1 and EB-2 visas, and meet the statutory criteria for the grant of such visas." *Id.* ¶ 18. Both organizations allege that "[s]ome of" their members "have approved petitions but have not been awarded visas after years of waiting in line, and some are applicants from countries for which there

9

is currently a backlog of applicants." *Id.* ¶¶ 17-18. Plaintiffs challenge the Gold Card program as allegedly unlawful and arbitrary and capricious under the Administrative Procedure Act ("APA"), as well as *ultra vires*.

Plaintiffs allege that the Gold Card program injures them (and AAUP's and UAW's members) because it will cause their immigrant visa petitions to be displaced and/or delayed. Plaintiffs claim that because of the alternative path to an EB-1 or EB-2 visa through the Gold Card program, other EB-1 and EB-2 visa applicants (like the individual named plaintiffs and the organizational plaintiffs' members) will be "crowded out of limited annual visa allotments" or will face delays due to "agency processing capacity" being consumed by the new program. *Id.* ¶¶ 5-6; *see also id.* ¶ 2. They also allege that Gold Card applicants will be able to "secure available visas ahead of traditional applicants through a streamlined application and adjudicatory process that gives them access to earlier priority dates and faster approval timelines." *Id.* ¶ 5.

## LEGAL STANDARD

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Its "irreducible constitutional minimum" consists of three elements. *Id.* at 560. A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

A motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) can be either facial—challenging the sufficiency of the allegations on the face of the complaint to establish standing—or factual. For facial challenges, courts "generally operate in a manner similar to a motion to dismiss under Rule12(b)(6) and do not consider materials outside the allegations in the pleadings." *Doe v. OPM*, 813 F. Supp. 3d 156, 179 (D.D.C. 2025) (cleaned up). For factual challenges, however, the Court "may consider material outside of the pleadings in ruling on a

motion to dismiss for lack of . . . subject-matter jurisdiction." *Artis v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002). "[W]hen a question of the District Court's jurisdiction is raised"— including a question of Article III standing—the Court "may inquire, by affidavits or otherwise, into the facts as they exist." *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 939 (D.C. Cir. 2012) (citation omitted); *see also, e.g.*, *El-Bey v. Mead*, No. 1:21-cv-01184 (TNM), 2021 WL 4963550, at *3 (D.D.C. Oct. 26, 2021) (noting that "[t]he Court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case" and dismissing on multiple grounds including standing (cleaned up)); *Tanner-Brown v. Jewell*, 153 F. Supp. 3d 102, 108 (D.D.C. 2016) (noting that, on Rule 12(b)(1) motion, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts," and dismissing for lack of standing).

## ARGUMENT

Before this Court may consider Plaintiffs' legal challenges to the Gold Card program, Plaintiffs must first establish that they have Article III standing to raise those challenges. They do not. The Gold Card program facilitates the issuance of visas for certain aliens, but it does not make it harder for other actual or potential visa petitioners such as Plaintiffs (including AAUP's and UAW's members) to secure visas. Thus, Plaintiffs cannot identify any injury-in-fact traceable to the Gold Card program.

Plaintiffs allege that Gold Card applicants will take limited visa slots that may otherwise have gone to Plaintiffs. That is not only too speculative as a legal matter, but also incorrect as a factual matter—there is no shortage of EB-1 or EB-2 visas for any of the individual Plaintiffs' native countries, and therefore Plaintiffs cannot show that the availability of visas to Gold Card

11

applicants will have any impact on their ability to secure such visas. Nor can Plaintiffs show that processing Gold Card petitions will delay their visa wait times. The number of Gold Card petitions is very small relative to the total pool of EB petitions; the multiplicity of factors that influence processing times make it impossible to trace any delay to the creation of the Gold Card; and the Gold Card petitions are processed by a different set of employees in all events. This challenge must therefore be dismissed for lack of standing.

The individual Plaintiffs are six foreign citizens (from Mexico, Colombia, Taiwan, and Ghana) who have sought or intend to seek EB-1 or EB-2 visas. *See* FAC ¶¶ 19-24. Organizational Plaintiff AAUP alleges that it also has members "who are pursuing or are eligible to pursue" those visas, and that AAUP itself has "an interest in American universities being able to hire and retain the most talented individuals in the world through the EB-1 and EB-2 visa pathways." *Id.* ¶ 17. Organizational Plaintiff UAW makes similar allegations with respect to its members and asserts that it has "a direct interest in the orderly allocation of limited employment-based immigrant visas in accordance with the statutorily mandated criteria within the EB-1 and EB-2 visa system." *Id.* ¶ 18. All of Plaintiffs' asserted harms thus hinge on the notion that the Gold Card program will impair the existing EB-1 and EB-2 pathways by "consum[ing]" the "limited number of available visas" that may otherwise have been awarded to Plaintiffs or their members, by "permit[ting] Gold Card applicants to secure available visas ahead of traditional applicants through . . . earlier priority dates and faster approval timelines," or by slowing down the processing or adjudication of visa applications by non-Gold Card applicants. *Id.* ¶ 5. For the reasons explained below, they cannot trace any such harms to the Gold Card program. Neither the individual nor the organizational Plaintiffs can establish Article III standing to challenge a program that merely provides an alternative means for other foreign citizens to lawfully enter the United States.

**I.     Article III requires a concrete injury fairly traceable to the challenged action.**

An injury in fact must be "(1) concrete, (2) particularized, and (3) actual or imminent." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). A concrete injury means an injury that is "direct, real, and palpable—not abstract." *Id.* A particularized injury means an injury that is "personal, individual, distinct, and differentiated—not generalized." *Id.* And an actual or imminent injury means an injury that is "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." *Id.* at 1293.

When the alleged injury is an increased risk of future harm, courts in this Circuit have required "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Id.* at 1295 (citing *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1234–35 (D.C. Cir. 1996)); *accord Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.,* 892 F.3d 1249, 1255 (D.C. Cir. 2018); *see also Entergy Ark., LLC v. FERC*, 134 F.4th 576, 583 (D.C. Cir. 2025). The D.C. Circuit evaluates the "substantial" standard with caution: "[W]e are mindful, of course, that the constitutional requirement of imminence as articulated by the Supreme Court—even if this Court has said it does not completely bar increased-risk-of-harm claims—necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Pub. Citizen*, 489 F.3d at 1296.

An injury must also be fairly traceable to the challenged action. That means "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The alleged injury cannot be "th[e] result [of] the independent action of some third party not before the court." *Id.* (brackets in original) (citation omitted). "[I]ndirectness . . . 'may make it substantially more difficult to meet the minimum requirement of Art. III[.]'" *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44-45 (1976) (citing *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).

And plaintiffs will fail to establish traceability where "[s]peculative inferences are necessary to connect their injury to the challenged actions." *Id.*

The analysis does not change when the plaintiff is an organization rather than an individual. Organizations can establish their own standing by "mak[ing] the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020) (brackets in original) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011)). "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (cleaned up). The organizational plaintiff must show "far more than simply a setback to the organization's abstract social interests." *Id.* (cleaned up); *see also id.* at 395 (rejecting a theory that "standing exists when an organization diverts its resources in response to a defendant's actions"). Alternatively, an organization can invoke associational standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1207 (D.C. 2002) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

## II.     Plaintiffs' "displacement" theory does not satisfy Article III.

Plaintiffs' main theory of standing is that the Gold Card program "causes the displacement of statutorily qualified applicants given the limited number of available visas and the preferential

treatment of Gold Card applications." FAC ¶ 5. In other words, they allege that the new Gold Card applicants will take EB-1 and EB-2 visas for which those applicants would not otherwise have been eligible, and thereby reduce the prospects that Plaintiffs (and AAUP's and UAW's members) will receive those visas. *See id.* ¶ 103 (alleging that "every employment-based visa issued to a Gold Card recipient is one fewer that remains available to other applicants under strict annual caps").

At the outset, this theory of standing is legally tenuous. The notion that a Gold Card applicant will take over a visa that would otherwise have gone to one of the named Plaintiffs is far too speculative to constitute a concrete injury. To establish standing based on the risk of missing out on a visa in the future—which is the crux of Plaintiffs' theory, because they do not allege they have yet been deprived of a visa—they must show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Pub. Citizen*, 489 F.3d at 1295; *see also Entergy Ark.*, 134 F.4th at 583. Asserting a "substantial" risk of losing a visa in the future that is "substantially" increased by the Gold Card program is far too speculative and hypothetical. Indeed, it is inconsistent with the very nature of visa processing, which involves thousands and thousands of potential visa issuances per year.

Plaintiffs are also simply incorrect about the facts. The factual premise of their theory is that "[d]emand for EB-1 and EB-2 visas frequently exceeds the number of available visas, especially for applicants chargeable to oversubscribed countries." FAC ¶ 58. But as Plaintiffs acknowledge, the only two countries for which EB-1 and EB-2 categories are not "current" as of June 2026 are China and India—and no Plaintiff is chargeable to China or India. *Id.*; Wilson Decl. ¶¶ 10, 12; Parker Decl. ¶¶ 11, 15-16, 18-19; U.S. Department of State, "Visa Bulletin for July 2026," https://perma.cc/R8G8-J2EN (last visited June 24, 2026). There are currently more than

15

enough EB-1 and EB-2 visas available to meet demand from applicants (other than applicants from China or India). Accordingly, opening eligibility to Gold Card applicants will cause no "displacement" for Plaintiffs. Plaintiffs' assertion that a "current" category "may be made 'unavailable'" at some hypothetical future date, FAC ¶ 59, is nothing more than additional speculation. Again, they do not allege that any individual Plaintiff or particular, identified member of AAUP or UAW belongs to a category that is not "current."

Nor is the current abundance of EB-1 visas unusual or aberrational. "With the exception of the period between August 2018 and April 2020, as well as rare periods at the end of a fiscal year when all visas had been exhausted, the EB1 category has been 'Current' for these countries every month since the Immigration Act of 1990, Pub. L. 101-649, went into effect." Parker Decl. ¶ 15. And the agencies do not expect this to change in the imminent future. *See id.* ("At this time, we do not expect demand from countries other than India and China to exceed the supply of EB1 visas[.]"). Plaintiffs' assertion that the Gold Card program will affect their opportunity to receive visas is thus implausible and insufficient to confer standing.[6]

In short, current and projected visa availability demonstrates that expanding the pool of eligible applicants will not harm Plaintiffs or their visa prospects in any way. That means that they suffer no concrete, imminent injury that is traceable to the Gold Card program.

## III.    Plaintiffs' "delay" theory does not satisfy Article III.

Plaintiffs' second, related theory is that the Gold Card program "delays the processing and adjudication of" EB visa petitions and "permits Gold card applicants to secure available visas ahead of traditional applicants through a streamlined application and adjudicatory process that

---

[6] Additionally, both visa demand and visa eligibility for both EB-1 and EB-2 visas fluctuate for various reasons.

gives them access to earlier priority dates and faster approval timelines." FAC ¶ 5. This theory fails too.

*First*, to the extent Plaintiffs contend that the submission of additional petitions will prolong adjudication of Plaintiffs' visa petitions, that is unfounded in law, mistaken in fact, and speculative.

Starting with the law, Plaintiffs cannot plausibly show that an increased number of immigrant visa petitions will cause their visa petitions to be processed or adjudicated more slowly than they otherwise would have been. This alleged harm is too "remote, speculative, conjectural [and] hypothetical" to qualify as a cognizable injury-in-fact traceable to the Gold Card program. *See Pub. Citizen*, 489 F.3d at 1293. Processing times depend on myriad factors and considerations unrelated to the Gold Card program:

> Many factors impact processing times, including the number of applications, petitions, or requests [USCIS] receive[s], workload allocations, and staffing levels, among other factors. Case-specific factors may also make an individual adjudication more complex, requiring additional adjudicative time. Some of these factors can also be influenced by the benefit requestor, such as if an application, petition, or request is incomplete when [USCIS] receive[s] it, or if an applicant, petitioner, or requestor receives a request for more information or misses an appointment for biometrics submission or interview.

U.S. Citizenship & Immigration Services, "Frequently Asked Questions About Processing Times," https://egov.uscis.gov/processing-times/processing-times-faqs (last visited June 23, 2026). To accept Plaintiffs' delay theory here could open the door to a bevy of other claims premised upon administrative considerations—including, for example, generous vacation leave policies—that may affect processing times. Instead, for a named Plaintiff to show that a delay flows from the Gold Card program, he or she must show—in a way that does not depend on mere speculation—that the program affects the processing of his or her visa application in a manner distinguishable from the effects of all of those other factors. Nothing in the FAC comes close to doing so.

17

Indeed, an applicant does not have *any* statutory right to a specific timeline for the processing of his or her visa application regardless of the various circumstantial factors—whether administrative or case-specific—that influence processing times. *See Taj v. U.S. Dep't of State*, No. CV 22-1087 (RDM), 2022 WL 17250302, at *6 (D.D.C. Nov. 28, 2022) (rejecting substantive and procedural due process claim alleging unreasonable delay in adjudicating visa application); *Echeverri v. USCIS*, No. 23-CV-21711-RAR, 2023 WL 5350810, at *8 (S.D. Fla. Aug. 21, 2023) (same; noting that "[s]ince the government is a sovereign entity with the power to exclude noncitizens, a noncitizen seeking entry typically 'has only those rights regarding admission that Congress has provided by statute'" (quoting *DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020))). Simply put, as courts have observed in other contexts, a "[p]laintiff does not have a 'clear right' to prompt adjudication of his visa petitions," "nor is there a statutory or regulatory right to adjudication within a specified time." *Adebayo v. U.S. Dep't of State*, No. 24-CV-2523 (LDH), 2025 WL 964096, at *3 (E.D.N.Y. Mar. 31, 2025) (quoting *Almakalani v. McAleenan*, 527 F. Supp. 3d 205, 226 (E.D.N.Y. 2021)).[7]

Regardless, the operational reality refutes this theory of standing. The Gold Card program has not meaningfully affected the processing or adjudication time for other EB-1 or EB-2 visa applications. Selby Decl. ¶ 11 ("[G]iven the ratio of the hours worked between Form I-140 EB-1 and EB-2 adjudication compared to Form I-140G adjudication, the Gold Card program has had no

---

[7] Nor, of course, does an applicant have a statutory right to an immigrant visa. *See Afshan v. U.S. Dep't of State*, No. 24-CV-3397 (APM), 2026 WL 538907, at *4 (D.D.C. Feb. 26, 2026) (noting "that '[a] noncitizen does not have a right to a visa, or a constitutionally protected interest in the procedures by which such visas are obtained'" (quoting *Khan v. Bitter*, No. 23-cv-1576 (BAH), 2024 WL 756643, at *8 (D.D.C. Feb. 23, 2024))); *Dean v. DHS*, No. CV 21-2002 (CKK), 2022 WL 2785967, at *8 (D.D.C. July 15, 2022) ("As the [Supreme] Court explained decades ago, an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government." (quotation marks omitted)).

meaningful impact on Form I-140 EB-1 and EB-2 processing times."). This is partly because to date, 483 requests for Gold Cards have been submitted—and 80 of those requestors submitted Form I-140G petitions for adjudication—in contrast to 51,371 EB-1 petitions and 116,193 EB-2 petitions in Fiscal Year 2025. *Id.* ¶ 8. Given the relative volumes of Gold Card and other EB-1 and EB-2 applications, tracing any systemic delays to the Gold Card applications would be impossible and incredible.

Moreover, contrary to Plaintiffs' apparent premise, Defendants have not reassigned employees from processing standard EB petitions to processing Gold Card petitions. Again, the total increase in work is marginal to date. *Id.* ¶ 10 ("From December 1, 2025 to May 31, 2026, . . . Immigration Services Officers (Officers) have logged 985 adjudicative hours dedicated to Form I-140G (Gold Card) program. During that same period, . . . Officers logged over 206,000 hours dedicated to Form I-140 EB-1 and EB-2 adjudications."). Of the 11 adjudicators working on Gold Card filings as their primary duty, *none* was transferred from working on other Form I-140 applications. *See id.* ¶¶ 8-9. In other words, those adjudicators represent *new* resources dedicated to the Gold Card program rather than resources *taken away* from other EB processing. (By contrast, 268 adjudicators are currently assigned to the much larger Form I-140 EB-1 and EB-2 workload. *Id.* ¶ 8.) Any delay in ordinary visa petition processing therefore is not caused by the Gold Card program, and it would not be redressed by this lawsuit.

*Second*, to the extent that Plaintiffs are contending that Gold Card petitioners will jump in line ahead of Plaintiffs, *see* FAC ¶ 5, their argument fails for two reasons. For one thing, despite their focus on the "orderly queue" for visas, *id.* ¶ 2, Plaintiffs make no mention of any priority dates they received and do not allege that Gold Card applicants with later priority dates have jumped any Plaintiff's position in line. They do not allege they have suffered any specific delay

19

traceable to the Gold Card program. Nor do they allege that overall wait times have increased since the establishment of the Gold Card program. Instead, Plaintiffs present suppositions of increased delay without *any* well-pleaded factual allegations as support. *See id.* ¶¶ 2, 5, 60, 101-06. Those pleading failures render the allegations underpinning Plaintiffs' "delay" theory impermissibly speculative and insufficient for Article III standing. *See Pub. Citizen*, 489 F.3d at 1293.

Additionally, Plaintiffs misunderstand the operation of the Gold Card program and how it fits within the statutory and regulatory framework governing visa processing and adjudication. Gold Card petitions will be assigned a priority date in the same manner as standard EB-1 and EB-2 visa petitions. It is not correct that the Gold Card program "gives [applicants] access to earlier priority dates." FAC ¶ 5. Gold Card visa applicants will largely proceed through the same process as standard EB-1 and EB-2 visa applicants according to the INA's requirements for case-by-case adjudication. *See* Selby Decl. ¶¶ 5-7. All else equal, the adjudication timeline for an EB-1 and EB-2 visa application is generally determined by an applicant's priority date and country of chargeability within a discrete category. And the Gold Card program will not alter the visa *availability* for applicants within the same category with identical priority dates and countries of chargeability. Crucially, however, as USCIS has explained, processing times depend on multiple factors independent of the Gold Card program. *See* U.S. Citizenship & Immigration Services, "Frequently Asked Questions About Processing Times," https://egov.uscis.gov/processing-times/processing-times-faqs (last visited June 23, 2026).

Thus, a priority date does not, in and of itself, dictate the total wait time for adjudication of an individual EB-1 or EB-2 petition. Selby Decl. ¶ 12. That is because visas are adjudicated on a case-by-case basis—and the multiple factors previously identified necessarily affect processing times. *See id.*; *see also* Parker Decl. ¶ 18 (stating that a Gold Card program participant "would face

the same Final Action Dates as the named individual plaintiffs" in the EB-2 category, "regardless of whether the participant filed a traditional EB2 [NIW] petition on Form I-140 or used Form I-140G for the Gold Card program," and noting that "the *visa availability* will be identical for all applicants in the same category who have the same priority date and country of chargeability" (emphasis added)). Simply put, a Gold Card applicant's $1-or-$2-million gift is just one factor supporting an individual's EB-1A or EB-2 application. So based upon consideration of these factors—along with other evidence relevant to case-by-case determinations of visa eligibility—a Gold Card applicant's visa *could* be adjudicated more swiftly than another applicant in the same visa category with an identical priority date and country of chargeability. But the reverse could be true as well: an ordinary EB-1A or EB-2 applicant with the same priority date could see his or her visa adjudicated more quickly than the Gold Card applicant. A Gold Card applicant will not necessarily have access to a "faster approval timeline[]." FAC ¶ 5.

All that is to say, any Gold Card applicant could have alternatively sought an EB-1A or EB-2 visa outside of the Gold Card program and received the same priority date. *Cf.* Parker Decl. ¶ 14 ("The only way in which the beneficiary of a Form I-140G could have a priority date earlier than that of one of the named individual plaintiffs is if the Form I-140G were submitted before a named plaintiff filed their own immigrant visa self-petition, or if the Form I-140G beneficiary already had a place in the EB1-3 visa queue based on a previously-approved Form I-140 and retained that priority date under 8 C.F.R. § 204.5(e)."). And as discussed, priority date alone does not dictate processing times. In sum, Gold Card applicants will not necessarily see their applications adjudicated ahead of EB-1 and EB-2 visa applicants with earlier priority dates, subject to the preference category and per-country limitations applicable to all applicants. Plaintiffs' allegations of programmatic line-jumping are thus factually erroneous and belied by the realities

21

of case-by-case visa processing and adjudication under existing law—which the Gold Card program in no way alters.

Against all this, Plaintiffs make projections about hypothetical future delays based on the Gold Card website, which states that applicants will receive "Special Benefits," "expedited" treatment, and receive residency in "record time." FAC ¶ 90. But Plaintiffs overread that language, which simply refers to two characteristics of the program. One: again, a Gold Card applicant's $1- or-$2-million monetary gift will be considered as evidence supporting the individual's EB-1A or EB-2 application. Two: by making the monetary gift, Gold Card applicants, through a NIW, will be able to bypass the employment verification process that USCIS typically conducts. *See* 8 U.S.C. § 1153(b)(2)(B)(i). It is hardly unusual for some visa pathways to require additional steps compared to others. For example, the process to obtain EB-1A and EB-2 NIW visas may be easier and faster than some of the other EB categories, because the latter require the Labor Department's review. 8 C.F.R. § 204.5(d); *see* Parker Decl. ¶ 9. None of that means that Gold Card applicants, once they receive a priority date, will automatically bump non-Gold Card applicants from the queues. Rather, it means that Gold Card applicants may receive expedited processing and adjudication (1) because their monetary gift will be deemed evidence of their extraordinary or exceptional ability in support of EB-1A or EB-2 eligibility, and (2) because a NIW permits them to bypass the employment verification process. Plaintiffs' allegations of automatic line-jumping misunderstand all of this.

Again: Plaintiffs do not allege they have suffered any specific delay in their EB-1 or EB-2 visa applications, or that the Gold Card program has actually caused overall wait times to increase. But to establish Article III injury through this theory, Plaintiffs must allege concrete facts showing

22

that some delay-based harm accrues (or will imminently accrue) to *them*. They have not. Their argument is insufficient to sustain Article III standing on the delay theory.

## IV. Because all Plaintiffs lack standing, the case must be dismissed.

For the reasons above, Plaintiffs cannot show that the Gold Card program causes them any injury in fact. It does not reduce their prospect of securing EB visas or substantially increase the risk that the processing or adjudication of their visa applications will be delayed. That defeats Article III standing for all six individual Plaintiffs.[8]

It also defeats standing for AAUP and UAW. They appear to suggest that they have associational standing on behalf of unnamed members who have applied or will apply for EB-1 or EB-2 visas. FAC ¶ 104. But that theory relies on the same "displacement" and "delay" injuries as the individual Plaintiffs. Because those injuries are insufficient for the reasons already explained, AAUP and UAW lack associational standing. Regardless, they have not identified any specific member with standing to sue. It "is not enough to aver that unidentified members have been injured." *U.S. Chamber of Com. v. EPA*, 642 F.3d 192, 199-200 (D.C. Cir. 2011). Where "organizations have not identified any members," they "do not have associational standing to bring a claim." *Green Oceans v. Dep't of the Interior*, No. 1:24-cv-141, 2025 WL 973540, at *8 (D.D.C. Apr. 1, 2025) (Leon, J.); *see also Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 193-94 (D.D.C. 2020); *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 69-70 (D.D.C. 2013), *on*

---

[8] Two of the individual Plaintiffs also face another standing hurdle: Plaintiffs Estrada-Montaño and Hernandez Cepeda fail to allege that they have applied for an EB-1 or EB-2 visa or even that they have any concrete plans to apply for one; thus, they fail to allege any imminent injury. *See* FAC ¶¶ 22-23. The FAC says these Plaintiffs "will file in the near term" or "very near term," *id.* ¶¶ 22-23, but those vague allusions to the operative legal standard do not pass muster. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Without a "description" of these purportedly definite and concrete plans or "even any specification of *when*" such plans will occur, these two Plaintiffs cannot demonstrate that their alleged injuries in fact are imminent. *Noble v. District of Columbia*, 685 F. Supp. 3d 1, 7 (D.D.C. 2023) (citing *Lujan*, 504 U.S. at 564).

*reconsideration in part*, 292 F.R.D. 145 (D.D.C. 2013); *Californians for Renewable Energy v. Dep't of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C. 2012).

It does not matter that AAUP and UAW allege that "[s]ome" of their members "have approved petitions but have not been awarded visas after years of waiting in line" or that "some are applicants from countries for which there is currently a backlog of applicants." FAC ¶¶ 17-18. For one thing, their purported "years of waiting in line" are plainly not attributable to the Gold Card program, which was instituted only last year. But more fundamentally, bare allegations that some unnamed members "are pursuing"—or merely "are eligible to pursue"—EB visas and are "from countries for which there is currently a backlog of applicants" does not confer associational standing because it "is not enough to aver that that unidentified members have been injured." *U.S. Chamber of Com.*, 642 F.3d at 199-200. Indeed, AAUP and UAW do not even concretely allege that any unidentified member has been injured; simply being from a backlogged country is not an injury in and of itself, and AAUP and UAW do not identify any specific EB-1 or EB-2 application that has, in fact, been delayed or displaced by the Gold Card program.

Finally, Plaintiffs also allege that the Gold Card program causes AAUP and UAW to face an "increased risk of losing members" because of "longer waits" and "uncertainty" over the ability to secure EB visas. FAC ¶ 104. These allegations, too, are inadequate. As described above, alleged injuries premised upon "increased risk" must meet a heightened standard. AAUP and UAW must show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Pub. Citizen*, 489 F.3d at 1295. Yet AAUP and UAW again rely on threadbare recitals of displacement and delay that could possibly disadvantage their members. Those allegations cannot sustain the theory of organizational standing any more than they can

24

sustain the associational theory or the individual Plaintiffs' standing. All of these theories ultimately rest on the same faulty predicates, precluding the Court's jurisdiction over this lawsuit.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the FAC under Rule 12(b)(1).

Dated: June 25, 2026

Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

/s/ *Elizabeth Hedges*
ELIZABETH HEDGES (DC No. 1657707)
Senior Counsel to the Assistant Attorney
General, Civil Division

STEPHEN ELLIOTT
Assistant Director
Civil Division, Federal Programs Branch

JORDAN A. HULSEBERG
Trial Attorney
Civil Division, Federal Programs Branch

United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Tel: (202) 616-0929
Email: Elizabeth.T.Hedges@usdoj.gov

*Counsel for Defendants*