**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al.,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

*Defendants*.

Civil Action No. 26-300 (RJL)

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. BECAUSE STANDING IS NOT DISPENSED IN GROSS, CERTAIN PLAINTIFFS LACK STANDING ENTIRELY; ALL PLAINTIFFS LACK STANDING AS TO SOME CLAIMS. ..... 5

II. ALL PLAINTIFFS LACK STANDING TO CHALLENGE THE GOLD CARD PROGRAM UNDER THEORIES OF DISPLACEMENT OR DELAY. ..... 7

A. Plaintiffs Cannot Establish Competitor Standing. ..... 10

B. Plaintiffs Cannot Show Standing Based on Number of Visas Available. ..... 16

C. Plaintiffs Fail To Demonstrate Any Delay In Their Adjudications ..... 21

III. PLAINTIFFS CANNOT DEMONSTRATE ASSOCIATIONAL STANDING ..... 25

CONCLUSION ..... 27

# TABLE OF AUTHORITIES

## CASES

*Adebayo v. U.S. Dep't of State*,
No. 24-cv-2523 (LDH), 2025 WL 964096 (E.D.N.Y. Mar. 31, 2025) .................................... 25

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) ............................................................................................ 11, 14

*Almakalani v. McAleenan*,
527 F. Supp. 3d 205 (E.D.N.Y. 2021) ......................................................................................... 25

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ................................................................................................................ 8

*Alstom Transp., Inc. v. Fed. R.R. Admin.*,
Case No. 24-cv-2098 (JMC), 2025 WL 3640503 (D.D.C. Dec. 16, 2025),
*appeal filed*, No. 25-5456 (D.C. Cir. Dec. 18, 2025) ............................................................... 14

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ..................................................................................................... 19

*Artis v. Greenspan*,
223 F. Supp. 2d 149 (D.D.C. 2002) ............................................................................................. 4

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................................................ 19

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ............................................................................................................. 6, 20

*Dep't of Homeland Sec. v. Thuraissigiam*,
591 U.S. 103 (2020) ................................................................................................................ 24

*Echeverri v. USCIS*,
Case No. 23-CV-21711-RAR, 2023 WL 5350810 (S.D. Fla. Aug. 21, 2023) ......................... 24

*El-Bey v. Mead*,
Case No. 1:21-cv-01184, 2021 WL 4963550 (D.D.C. Oct. 26, 2021),
*aff'd*, 2023 WL 117698 (D.C. Cir. Jan. 6, 2023) ............................................................... 4

*Entergy Ark., LLC v. Fed. Energy Regul. Comm'n*,
134 F.4th 576 (D.C. Cir. 2025) ................................................................................................... 8

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ....................................................................................................... 5

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ........................................................................................ 17

*Herbert v. Nat'l Acad. of Scis.*,
974 F.2d 192 (D.C. Cir. 1992) .......................................................................................... 4

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ......................................................................................................... 25

*La. Energy & Power Auth. v. Fed. Energy Regul. Comm'n*,
141 F.3d 364 (D.C. Cir. 1998) ........................................................................................ 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................................................ 4, 6, 19

*Mobile Relay Assocs. v. FCC*,
457 F.3d 1 (D.C. Cir. 2006) ............................................................................................ 14

*New World Radio, Inc. v. FCC*,
294 F.3d 164 (D.C. Cir. 2002) ........................................................................................ 16

*PSSI Glob. Servs., L.L.C. v. Fed. Commc'ns Comm'n*,
983 F.3d 1 (D.C. Cir. 2020) ......................................................................................... 8, 14

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007) ................................................................................ 8, 9, 17

*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010) ..................................................................................... 10, 16

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........................................................................................................... 4

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ........................................................................................................... 5

*Taj v. U.S. Dep't of State*,
Civ. A. No. 22-1087 (RDM), 2022 WL 17250302 (D.D.C. Nov. 28, 2022) ........................... 24

*Tanner-Brown v. Jewell*,
153 F. Supp. 3d 102 (D.D.C. 2016),
*aff'd sub nom. Tanner-Brown v. Zinke*, 709 F. App'x 17 (D.C. Cir. 2017) ............................... 4

*Timbisha Shoshone Tribe v. Salazar*,
678 F.3d 935 (D.C. Cir. 2012) .......................................................................................... 4

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................................................................... 5

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
50 F.4th 164 (D.C. Cir. 2022) ........ 15

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
518 F. Supp. 3d 448 (D.D.C. 2021) ........ 15

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
892 F.3d 332 (D.C. Cir. 2018) ........ 10, 14, 15

**STATUTES**

8 U.S.C. § 1152 ........ 2, 18

8 U.S.C. § 1153 ........ 11, 12

**RULES**

Fed. R. Civ. P. 12 ........ 4, 5

**REGULATIONS**

8 C.F.R. § 204.5 ........ 13

The Gold Card,
Exec. Order No. 14,351, 90 Fed. Reg. 46,031 (Sep. 19, 2025) ........ 1

# INTRODUCTION

The President's Executive Order "The Gold Card" directed the establishment of "a visa program . . . that will facilitate the entry of aliens who have demonstrated their ability and desire to advance the interests of the United States by voluntarily providing a significant financial gift to the Nation." Exec. Order No. 14,351, § 1, 90 Fed. Reg. 46,031, 46,031 (Sep. 19, 2025) ("EO"). The Gold Card program recognizes a new way that aliens may demonstrate eligibility for certain employment-based ("EB") visas, "consistent with law and public safety and national security concerns": If an alien makes an unrestricted gift of $1 million—or $2 million for a corporation or similar entity donating on an individual's behalf—that gift is considered as evidence of the alien's extraordinary or exceptional ability and substantial benefit to the United States, in support of EB-1A or EB-2 visa eligibility. *See id.* § 2. In so doing, the Gold Card program both advances the United States's interest in lawful immigration, by "prioritizing the admission of aliens who will affirmatively benefit the Nation, including successful entrepreneurs, investors, and businessmen and women[,]" *id.*, and benefits the aliens who are able and willing to apply. Simply put, it is a win-win for our nation.

Plaintiffs—individual aliens who have applied, or (still) plan to apply, for EB visas; the American Association of University Professors ("AAUP"); and the United Automobile, Aerospace, and Agricultural Implement Workers of America, AFL-CIO ("UAW")—see things differently. In an attempt to establish an injury traceable to the Gold Card program, they erroneously cast the issuance of EB visas in reductionist, zero-sum terms. Plaintiffs complain that Gold Card applicants benefit from the program; but as the D.C. Circuit has recognized, that a policy benefits someone else does not imply that those whom it does not specifically benefit have suffered a cognizable injury in fact under Article III. Where Plaintiffs do complain of their harms,

they repeatedly invoke harms that are neither concrete and actual nor fairly traceable to the Gold Card Program, such as ongoing backlogs for EB-1 and EB-2 visas chargeable to India and China, and the time it takes them to prepare an EB visa application and compile the necessary materials. But Plaintiffs fail to connect those harms to the Gold Card Program nor would they be redressable by shutting this new program down. To demonstrate standing, Plaintiffs must allege and show that they have suffered a concrete injury from the new policy. They cannot.

First, standing is not dispensed in gross. Plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. The Gold Card Program incorporates EB-1A and EB-2 visas that, depending on both preference category and per-country limitations, do not affect all Plaintiffs, and it has operational characteristics, such as a $15,000 processing fee, by which none of Plaintiffs are injured. Plaintiffs cannot plausibly demonstrate they possess standing to challenge the Gold Card Program as a whole.

Second, Plaintiffs fail to establish a concrete injury in fact fairly traceable to the Gold Card Program. Each Plaintiff's theory of harm turns on their speculation that the benefits to others may, through a series of events, potentially have negative consequences for them. Article III requires more. Plaintiffs must show a substantially increased risk of harm and a substantial probability of harm with that risk taken into account. Indeed, Plaintiffs would have to argue that: a substantial number of aliens through the Gold Card Program flood the application process, that in the absence of the Gold Card Program these aliens would not have otherwise sought EB-1 or EB-2 visas, that the aliens seeking Gold Cards are in the same queue as one of the plaintiffs (or that the two queues are temporarily linked during a quarter under the exception to the per-country limit found in 8 U.S.C. § 1152(a)(5)), that visas are available based on category, priority date, and country of chargeability to the aliens seeking Gold Cards, that the Gold Card petitions will be conditionally

approved, that the aliens seeking the Gold Cards will complete pre-processing with the Department of State, that the Department of State will find the aliens admissible and otherwise eligible for immigrant visa issuance, that the aliens seeking Gold Cards or their corporate sponsors will make the required gift to the U.S. Government, that the Department of State will issue the immigrant visas, that issuance of the immigrant visas through the Gold Card Program within the plaintiff's queue would be in such a significant amount that it would delay the forward movement of the plaintiff's Final Action Date or result in visas becoming unavailable to the plaintiff past the end of the current fiscal year, and that this will all take place before the plaintiff completes his or her immigrant visa or adjustment of status process, and that all of this in fact substantially delayed the applications. Plaintiffs are unable to do so and so instead turn to a novel application of competitor standing. But no court has ever applied competitor standing doctrine to visa applications nor is there a basis to find that such a novel application of the doctrine is appropriate here. Even still, Plaintiffs ultimately fail to establish that *any* delay has occurred in their visa processing. Nor can Plaintiffs establish that any future delay is substantially likely to occur merely because there are a finite number of visas.

Third, plaintiffs AAUP and UAW fail to establish associational standing because none of their members is injured by the Gold Card Program. Similarly, the two organizations lack standing to sue in their own right because their alleged injuries are equally—if not more—speculative as the injuries alleged by the individual Plaintiffs.

This Court should therefore grant Defendants' motion to dismiss Plaintiffs' amended complaint.

## ARGUMENT

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Its "irreducible constitutional minimum" consists of three elements. *Id*. at 560. A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) can be either facial—challenging the sufficiency of the allegations on the face of the complaint to establish standing—or factual.

### I. BECAUSE STANDING IS NOT DISPENSED IN GROSS, CERTAIN PLAINTIFFS LACK STANDING ENTIRELY; ALL PLAINTIFFS LACK STANDING AS TO SOME CLAIMS.

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Before addressing Plaintiffs' broader theories, this Court should dismiss certain Plaintiffs and certain claims at the outset.[1]

First, Plaintiffs who had yet to apply for a visa at the time of the Complaint's filing lack standing to challenge the Gold Card Program. Plaintiffs Estrada-Montano and Hernandez Capeda did not allege they had even applied for an EB-1 or EB-2 visa or had sufficiently concrete plans to do so. *See* First Am. Compl. ¶ 22, ECF No. 32 ("FAC") ("Dr. Estrada will file in the near term a

---

[1] Plaintiffs lack standing to challenge Defendants' alleged failure to engage in notice-and-comment rulemaking in establishing the Gold Card Program. *See* Compl. ¶¶ 129-34. For example, in *Summers v. Earth Island Institute*, the Supreme Court rejected respondents' argument "that they have standing to bring their challenge because they have suffered procedural injury" in the form "that they have been denied the ability to file comments on some [agency] actions and will continue to be so denied." 555 U.S. 488, 496 (2009). That is because the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.*; *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664-68 (D.C. Cir. 1996). The same is true here.

self-petition for lawful permanent residence through an EB-2 petition"); *id.* ¶ 23 ("Dr. Hernandez will file in the very near term an EB-2 petition"). Plaintiff Estrada-Montano still has not filed a petition. *See, e.g.*, Decl. of Aldo Salvador Estrada-Montano ¶ 14, ECF No. 37-6 ("Estrada-Montano Decl.") (speculating on what might happen "[o]nce I file my petition" without providing any timeline for filing). "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury.'" *Lujan*, 504 U.S. at 564 (citation omitted). And although Plaintiff Hernandez Capeda declares that she has now filed, she had not filed at the time of the operative complaint. *Compare* Decl. for Ma. Elena Hernandez Cepeda ¶ 6, ECF No. 37-7 ("Hernandez Capeda Decl.") (declaring she filed "[o]n May 29, 2026"), *with* FAC (filed May 18, 2026). This is fatal because "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added). Similarly, Plaintiff Cerna-Chavez had his EB-1A petition denied, and he does not aver that has filed an EB-2 petition. Decl. of Rodrigo Cerna-Chavez ¶¶ 1 & 10-12, ECF No. 37-3 ("Cerna-Chavez Decl."). He, too, cannot establish standing and must be dismissed from this case.

Second, Plaintiffs' speculations on the availability of EB-2 visas chargeable to India cannot supply standing to challenge the Gold Card Program's alleged impact on *EB-1* visa issuance. The Morrison Declaration's projections address only Roe 2 and Doe 4, who are both EB-2 India applicants. Decl. of Bruce A. Morrison ¶¶ 29-35, ECF No. 37-10 ("Morrison Decl."). This assumes that some Gold Card numbers will be issued to aliens from countries other than China and India within EB-2 and then projects that this will reduce the number of visas available to aliens chargeable to India. But this analysis says nothing about whether the Gold Card Program will

injure Roe 1 in the distinct EB-1 China queue. Because standing must be established separately for each claim, Plaintiffs cannot use an asserted EB-2 injury to carry their challenge to the Gold Card Program's use of the EB-1 category.

Third, Plaintiffs must demonstrate standing as to each and every request for relief. Plaintiffs ask this court to "[h]old unlawful and set aside . . . the imposition of a nonrefundable $15,000 processing fee" for Gold Card applications. FAC, Prayer for Relief ¶ C. But that fee is paid by Gold Card applicants, not Plaintiffs. Plaintiffs suffer no harm or injury from the imposition of fees on Gold Card applicants. More to the point, vacating the fee would not reduce the asserted competitive harm; if anything, making the Gold Card application less expensive could increase participation. Plaintiffs therefore lack standing to challenge this aspect of the program.

## II. ALL PLAINTIFFS LACK STANDING TO CHALLENGE THE GOLD CARD PROGRAM UNDER THEORIES OF DISPLACEMENT OR DELAY.

Plaintiffs do not allege that they wish to apply for EB-1 or EB-2 visas through the Gold Card Program. Rather, their theory of harm turns on their speculation that the issuance of EB-1 or EB-2 visas through the program may, through a series of events, potentially have negative consequences for them, in the form of alleged displacement or delayed processing of their visa petitions and those of other non-Gold Card EB-1 and EB-2 visa applicants, especially those from backlogged countries. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss at 1, ECF No. 37 ("Opp.") at 18-27. But to establish standing based on the risk of delay or displacement within the visa queue in the future—which is the crux of Plaintiffs' theory, because they do not allege they have yet been deprived of a visa—they must show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) (emphasis in original); *see also Entergy Ark., LLC v. Fed. Energy Regul. Comm'n*, 134 F.4th 576, 583 (D.C. Cir. 2025).

Asserting a "substantial" risk of losing a visa in the future that is "substantially" increased by the Gold Card Program is far too speculative and hypothetical. Indeed, it is inconsistent with the very nature of visa processing, which involves thousands and thousands of potential visa issuances per year.

Throughout their brief, Plaintiffs begrudgingly recite the many benefits the Gold Card Program confers on applicants. *See, e.g.*, Opp. at 1 (complaining of "[t]he special access given to Gold Card applicants"); *id.* ("Gold Card applicants have advantages at each stage of the EB visa process"); *id.* ("Gold Card applicants can submit a complete application . . . far more quickly"); *id.* ("The Gold Card applicants apply using a single form, estimated to take five hours"); *id.* at 18 ("Gold Card applications take substantially less time to prepare than [ordinary] applications"); *id.* at 19 ("From there, the Gold Card applicant is ushered through the remaining steps with concierge-level service"); *id.* at 20 ("The substantial advantages in the application process are increased by the staff dedicated to processing Gold Card applicants."); *id.* ("According to Defendants, the ratio of staff to applicants is higher by a multiple of at least 10 for Gold Card applicants compared to that of non-Gold Card applicants."). But even where a third party "benefits from something allegedly unlawful," courts have not found a plaintiff to be "injured for Article III purposes," and the Supreme Court has "never accepted such a boundless theory of standing." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013); *see also PSSI Glob. Servs., L.L.C. v. Fed. Commc'ns Comm'n*, 983 F.3d 1, 11-12 (D.C. Cir. 2020) (rejecting "claims that the favorable regulatory treatment of a competitor has caused a skewed playing field"). It is not enough to allege that others may experience some convenience. Plaintiffs must themselves be harmed.

Yet when it comes to harms, Plaintiffs belabor many hardships that were not caused by—and, in the case of existing backlogs, long predated—the Gold Card Program. For example,

Plaintiffs complain that Roe 2 allegedly faced a roughly 16-year EB-2 backlog, even in the absence of the Gold Card Program. *See* Morrison Decl. ¶ 29 ("It took almost 16 years for the cutoff to make that priority-date advance and stand at July 15, 2014 in April 2026"). Similarly, Doe 4 has allegedly waited in line for an EB-2 visa since 2023, because of the longstanding India EB-2 backlog. *See id*. (noting that "Doe 4 has a priority date in April 2023"; that "[t]he April 2026 Visa Bulletin listed July 15, 2014, as the cut-off date for EB-2 India"; and that "[a] comparable 69-month advance in the EB-2 India cut-off date-from October 1, 2008, to July 15, 2014-took nearly eleven years"), *id.* at ¶ 30 (noting "the lack of advancement in the cutoff date for EB-2 India in recent years"). Moreover, Plaintiff Cerna-Chavez's EB-1 petition was denied on the merits, for reasons entirely unrelated to the Gold Card Program. Cerna-Chavez Decl. ¶¶ 10-12. AAUP members Roe 1 and 2 and UAW members Does 1 to 4 are "chargeable to China or India," which they admit have had "EB-1 and EB-2 backlogs . . . consistently . . . since 2017." Opp. at 23. At bottom, Plaintiffs' emphasis on existing visa backlogs amounts to little more than a general critique of the ordinary visa adjudication and allocation process—coupled with speculation as to how the Gold Card Program might *possibly* affect existing visa availability in already backlogged EB queues. But these generalized complaints cannot establish standing to challenge the Program, and the Court should not credit them in its standing analysis. *See Pub. Citizen,* 489 F.3d at 1293 (an actual or imminent injury means an injury that is "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical").

Plaintiffs present three theories for how the Gold Card Program might cause some alleged injury: (A) Plaintiffs propose a first-of-its-kind application of competitor standing to the visa approval process, (B) Plaintiffs likewise argue a finite number of visas will necessarily result in delayed visa adjudication and processing, (C) and Plaintiffs rely on speculations of possible delay

without affirmatively identifying *any* delay attributable to the Gold Card Program. The Court should reject each theory.

**A. Plaintiffs Cannot Establish Competitor Standing.**

Plaintiffs invoke competitor standing, arguing that the Gold Card Program "puts EB applicants applying through the statutory pathway at a competitive disadvantage." Opp. at 18. In so doing, Plaintiffs aver that the alleged delay that will purportedly "result from Gold Card applicants being placed at the front of the line and receiving EB-1 and EB-2 visas creates harm" that is "analogous to the typical harm recognized in competitor standing cases." *Id.* at 25. As a threshold matter, this argument has no place here; the line of cases upon which Plaintiffs rely arose in the context of economic regulations of utilities and has never been applied to the context of visa applications. These cases only "recogniz[e] that economic actors 'suffer [an] injury in fact when agencies . . . allow increased competition' against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *La. Energy & Power Auth. v. Fed. Energy Regul. Comm'n*, 141 F.3d 364, 367 (D.C. Cir. 1998)). But a plaintiff must still show the "basic requirement common to all our cases," namely, "an actual or imminent increase in competition" affecting a plaintiff who is a "direct and current competitor[]" in the relevant market. *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 339-40 (D.C. Cir. 2018) (quoting *Sherley*, 610 F.3d at 73). The D.C. Circuit has since clarified that "the competitor standing doctrine supplies the link between increased competition and tangible injury but does not, by itself, supply the link between the challenged conduct and increased competition." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023). Nonetheless, Plaintiffs contend that "[a]gency action can cause . . . competitive harm either by expanding the pool of competitors, for example, by 'allow[ing] new entrants into a fixed regulated market,' or by providing a more favorable set of conditions for a subset of

competitors that will make it more difficult for others to compete." Opp. at 35 (quoting *id.* at 280). Plaintiffs cite no authority establishing that the statutory allocation and adjudication of visas constitutes an analogous "fixed regulated market" as contemplated by the competitor standing doctrine.

But even assuming, arguendo, that this line of cases concerning economic injury among marketplace competitors is applicable to the visa context, Plaintiffs cannot establish the requisite causal link for competitor standing because they fail to plausibly allege that Plaintiffs compete with Gold Card Program applicants for available EB-1 and EB-2 visas. Critically, as a purely statutory matter, the relevant market is not the worldwide universe of EB-1 and EB-2 applicants. Congress required Defendant agencies to allocate employment-based visas through a noncompetitive process that does not see aliens vying for the same individual visa by being better than another. EB-1A visas are available to certain aliens with "extraordinary ability in the sciences, arts, education, business, or athletics," who "seek[] to enter the United States to continue work in the area of extraordinary ability," and whose entry "will substantially benefit" the United States. 8 U.S.C. § 1153(b)(1)(A); FAC ¶¶ 36-38. EB-2 visas are available to "qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States." 8 U.S.C. § 1153(b)(2)(A); FAC ¶ 42.

Gold Card applicants still have their petitions vetted by the Department of Homeland Security and must visit a U.S. consulate and interview with a consular officer to ensure they are suitable for admission. Decl. of Cara M. Selby ¶ 7, ECF No. 34-3 ("Selby Decl."); Decl. of Stuart

Wilson ¶ 4, ECF No. 34-2 ("Wilson Decl."). Aliens who must wait for visa availability will continue to have their immigrant visa petitions and applications processed according to their priority date and the current final action date, regardless of whether they are a Gold Card applicant. *See* Decl. of Andrew Parker ¶¶ 12-14, 18, ECF No. 34-1 ("Parker Decl.").

Moreover, as Defendants have explained, priority date alone does not dictate processing times, *see* Defs.' Mot. to Dismiss First Am. Compl. and Mem. in Supp. at 21, ECF No. 34 ("MTD"): The Gold Card Program will not alter the visa *availability* for applicants within the same category and countries of chargeability with identical priority dates; processing times depend on myriad factors unrelated to the Gold Card Program, consistent with case-by-case visa processing and adjudication; and thus Gold Card applicants will not necessarily see their applications adjudicated earlier than EB-1 and EB-2 visa applicants with earlier priority dates, subject to the preference category and per-country limitations which are applicable to all applicants.

All of this means that applying for a Gold Card does not allow a person to take another applicant's spot in line if they followed different application paths. *See id.* at 21-22 (explaining that that "Plaintiffs' allegations of programmatic line-jumping are both factually erroneous and belied by the realities of case-by-case visa processing and adjudication under existing law—which the Gold Card [P]rogram in no way alters"). Although a Gold Card application may require less processing time because the $1-or-$2-million gift provides *evidence* supporting eligibility, that does not mean that other EB-1 and EB-2 applications require more processing time than they otherwise would. For example, a Gold Card Program applicant for an EB-2 visa from India who files after December 2025 has a later priority date than that of Roe 2 (April 2020). Decl. of John Roe 2 ¶ 4, ECF No. 37-9 ("Roe 2 Decl."). Similarly, a new Gold Card Program applicant for an EB-1 visa from China has a priority date that is later than Roe 1 (September 2025). Decl. of Dr.

Todd Wolfson ¶ 14, ECF No. 37-1 ("Wolfson Decl."). Plaintiffs fail to identify a single Gold Card applicant who has displaced, or legally could displace, the priority dates of any Plaintiff in the same queue. In sum, the Gold Card Program provides an alternative way to establish eligibility for an EB-1 and EB-2 visa by providing evidence of extraordinary or exceptional ability within the INA's existing statutory framework. It does not make it more difficult for other EB-1 or EB-2 applicants to receive a visa, nor does it render a Gold Card applicant a "competitor" to any Plaintiff seeking an EB-1 or EB-2 visa.

Notwithstanding the above, Plaintiffs attempt to compare a Gold Card Program applicant with a non-Gold Card applicant who decided to begin pursuing a visa at the same time. But the INA assigns no significance to when a potential future applicant subjectively decides to pursue an application. Indeed, Plaintiffs' Declarant concedes as much. *See* Morrison Decl. ¶ 10 ("A person who has not yet filed has no priority date to preserve, even if that person has been working for months to assemble the evidence needed for a petition."). The priority date, as a general matter, is the filing date of a petition's acceptance. *See* 8 C.F.R. § 204.5(d). This makes sense: a subjective starting point would be wholly inadministrable, either by an agency or a court.

But, more to the point, the mere fact that the Gold Card program supplies an alternative means of establishing EB-1 and EB-2 eligibility—even if arguably more streamlined or expeditious—does not constitute an injury to Plaintiffs for purposes of the competitor standing doctrine. As courts have repeatedly made "clear . . . an agency action does not confer competitor standing if it merely 'create[s] a skewed playing field,' . . . by, for example, providing a 'windfall' to a competitor." *Air Excursions LLC*, 66 F.4th at 280 (citations omitted); *see*, *e.g., PSSI Glob. Servs.*, 983 F.3d at 11 ("a party cannot establish competitor standing merely by claiming that a rival's favorable tax treatment has created an unfair competitive atmosphere." (citation omitted));

*Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13 (D.C. Cir. 2006) (rejecting argument that "[a]gency action that results in such a 'skewed playing field' among competitors . . . is a sufficiently redressable injury to confer standing"); *Alstom Transp., Inc. v. Fed. R.R. Admin.*, Case No. 24-cv-2098 (JMC), 2025 WL 3640503, at *8 (D.D.C. Dec. 16, 2025) ("But the mere fact that the government conferred some allegedly unlawful advantage to a competitor, even one that 'skew[s] [the] playing field,' does not 'supply the link between the challenged conduct and increased competition.'" (quoting *Air Excursions LLC*, 66 F.4th at 281)), *appealed*, No. 25-5456 (D.C. Cir. Dec. 18, 2025). Plaintiffs must connect the alleged benefit Gold Card applicants receive to some harm they experience, and they have not done so. This is insufficient to establish Article III injury.

Plaintiffs' reliance on various other inapposite cases is similarly unavailing. First, *Washington Alliance of Technology Workers* involved a challenge to a 2016 rule that directly authorized approximately 34,000 individuals to enter the STEM labor market through the Optional Practical Training ("OPT") program. 892 F.3d at 340. The plaintiffs were able to demonstrate causation for standing purposes because their "members compete[d] for jobs" in the same STEM labor market as the OPT workers. *Id.* at 341. Indeed, at summary judgment, it was "undisputed" that the "OPT program increase[d] the amount of foreign labor in the STEM labor market." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 176 (D.C. Cir. 2022) (quoting *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 518 F. Supp. 3d 448, 461 (D.D.C. 2021)). As in other economic contexts, the D.C. Circuit ultimately found that this flood of tens of thousands of workers into the same competitive economic market was a cognizable injury that could be redressed through a judicial decision that "would accordingly reduce competition in that market." *Id.* at 177. But here, there is no single, undifferentiated market. Rather, Plaintiffs and Gold Card applicants seek—or, in the case of certain Plaintiffs, plan to seek—EB visas through

different means of demonstrating the requisite extraordinary or exceptional ability and substantial benefit to the United States within the INA's statutory framework. That statutory process sorts applicants based on country of chargeability, visa type, and priority date. Even Plaintiffs may be slotted in the queue ahead of Gold Card applicants when in the same visa preference and country categories. *See* MTD at 21 (noting that "an ordinary EB-1A or EB-2 applicant with the same priority date could see his or her visa adjudicated more quickly than the Gold Card applicant," and that "[a] Gold Card applicant will not necessarily have access to a 'faster approval timeline[]'" (quoting FAC ¶ 5)). Whether the processing of a Gold Card EB visa application will in any way affect a non-Gold Card applicant's petition would depend on a complex interaction of the applicants' selected visa preference categories, the per-country limitations applicable to them both, the current status of the visa schedule, the sufficiency of each applicants' application materials, and even the time of year. This does not change merely because there are finite visas. Ultimately, this is a far cry from the direct, immediate participation of tens of thousands of new STEM workers in a crowded economic labor market at issue in *Washington Alliance*.

*Sherley* is likewise distinguishable. The challenged guidelines in that case immediately expanded the number of applicants competing for a "fixed amount of money." 610 F.3d at 74. There was "no doubt" that "the Guidelines" would "elicit an increase in the number of grant applications[,]" and the Government did not dispute this. *Id.* But here again, Plaintiffs do not place all visa applicants in a single queue for an undifferentiated award. Rules concerning category, chargeability, priority date, readiness for final action, and allocation determine whether two applicants may compete for the same visa number. And as noted, Gold Card applicants cannot displace members who received an earlier priority date.

This case instead resembles *New World Radio, Inc. v. FCC*, where the challenged agency action was merely "the first step in the direction of future competition" and depended on a "chain of events" that the court found "too remote to confer standing." 294 F.3d 164, 172 (D.C. Cir. 2002). There, the court clarified that the competitor standing doctrine is limited "to an agency action that itself imposes a competitive injury, i.e., that provides benefits to an existing competitor or expands the number of entrants in the petitioner's market, not an agency action that is, at most, the first step in the direction of future competition." *Id*. So too, here. The Gold Card Program provides a streamlined process for the initial step of securing a place in line, namely, priority. But that does not mean Plaintiffs can show that they are at a competitive disadvantage.

**B. Plaintiffs Cannot Show Standing Based on Number of Visas Available.**

Plaintiffs have not plausibly alleged that the Gold Card Program will reduce the availability of visas for non-Gold Card EB applicants and substantially increase the likelihood that they will suffer any concrete injury. Plaintiffs repeatedly assert, in conclusory fashion, that visa allocation is inherently "zero-sum," but that incantation cannot establish injury to any identified Plaintiff. On the contrary, EB visa allocation hinges upon a complex and dynamic concatenation of events—including actions by third parties to this suit, such as decision making by other EB-1 or EB-2 applicants or sponsoring employers—that are unrelated to the Gold Card Program and which dynamically affect visa allocation and distribution across EB categories during a fiscal year. *Cf.* Opp. at 5 ("The final action dates are not fixed, and they can move in either direction depending on demand and the remaining supply for the fiscal year. For example, if it becomes necessary during the monthly allocation process, the State Department may retrogress a final action date—that is, reset it to an earlier date—such that additional visa requests are honored only if the applicants' priority dates are earlier than the newly announced date."); Morrison Decl. ¶ 12 ("A

designation of current does not mean that the category has an unlimited supply or that it will remain current through the fiscal year. It means that, *for the month covered by the Bulletin*, the Department projects enough numbers to meet the demand then known and reported."). Plaintiff has failed to plausibly allege that the Gold Card Program has had any effect whatsoever on visa availability for a named Plaintiff—or upon EB visa availability more generally. This is insufficient to establish Article III standing.

The D.C. Circuit has only "allowed standing when there was at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Pub. Citizen, Inc.*, 489 F.3d at 1295. The court has counseled that even if precedent "does not completely bar increased-risk-of-harm claims," it "necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Id.* at 1296; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015). Plaintiffs cannot show either element.

Plaintiffs fail to provide any reliable statement of how many Gold Card recipients will use EB-1 or EB-2 numbers, how many represent incremental demand, how many numbers otherwise would have flowed to a particular queue, or how the marginal change would affect a particular cutoff date. Defendant agencies regularly experience fluctuating demand for different EB visa preference categories depending on geopolitical factors, per-country limitations, and the time of year. But in order for Plaintiffs to establish standing based on the capped number of visas, they would have to argue that: a substantial number of aliens through the Gold Card Program flood the application process, that in the absence of the Gold Card Program these aliens would not have otherwise sought EB-1 or EB-2 visas, that the aliens seeking Gold Cards are in the same queue as one of the plaintiffs (or that the two queues are temporarily linked during a quarter under the

exception to the per-country limit found in 8 U.S.C. § 1152(a)(5)), that visas are available based on category, priority date, and country of chargeability to the aliens seeking Gold Cards, that the Gold Card petitions will be conditionally approved, that the aliens seeking the Gold Cards will complete pre-processing with the Department of State, that the Department of State will find the aliens admissible and otherwise eligible for immigrant visa issuance, that the aliens seeking Gold Cards or their corporate sponsors will make the required gift to the U.S. Government, that the Department of State will issue the immigrant visas, that issuance of the immigrant visas through the Gold Card Program within the plaintiff's queue would be in such a significant amount that it would delay the forward movement of the plaintiff's Final Action Date or result in visas becoming unavailable to the plaintiff past the end of the current fiscal year, and that this will all take place before the plaintiff completes his or her immigrant visa or adjustment of status process. After all, even if the statutory cap is hit, it immediately resets at the end of the fiscal year, everyone keeps his place in line, and it is unclear that the next adjudicator in this long process would have necessarily acted on the petition during that brief interim. Similarly, whether USCIS "does not . . . restore the prior cut-off date" due to limited "annual supply" and an "applicant's priority date . . . remain[s] beyond [the] cutoff," as the Morrison Declaration suggests, ¶ 23, likewise relies on an attenuated string of speculation. The Supreme Court has made clear that a "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). "[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 413.

The D.C. Circuit has strictly applied this understanding in the context of immigration. In *Arpaio v. Obama*, that court began by explaining that "it is ordinarily substantially more difficult

to establish" standing in "a case that turns on third-party conduct." 797 F.3d 11, 20 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 562). That plaintiff's theory of standing "relie[d] on a predicted chain of events" that included speculation that DHS would refrain from removing Deferred Action for Childhood Arrivals ("DACA") and Deferred Action for Parents of Americans ("DAPA") beneficiaries, that foreign citizens outside the United States ineligible for DACA or DAPA will learn of those policies, that those people will decide to enter the United States unlawfully, and that some of those new arrivals will settle in a particular locality. *Id.* at 19-20. The Court ultimately rejected the theory as too "attenuated" a "basis for standing." *Id.* at 20. So, too, here; Plaintiffs' theory of standing depends on speculation about how Defendants will implement immigration policy writ large, the decisions of third-party non-citizens abroad that may affect demand for EB-1A and EB-2 visas, specific eligibility and admissibility determinations, and the behavior and response rates of other individuals applying under the EB-1 and EB-2 visa categories. Plaintiffs cannot elide this Rube Goldberg chain by collapsing it under the slogan of "zero sum."

Plaintiffs heavily rely on developments after they filed their operative complaint on May 18, 2026. FAC. This includes, for example, recent Visa Bulletins, the May 22 India EB-2 country limit exhaustion, and the July 31 judicial decision concerning the 75-country issuance pause. But as noted, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis*, 554 U.S. at 734. The later developments referenced by Plaintiffs simply cannot confer Article III jurisdiction that did not exist at the time the operative complaint was filed.

Moreover, Defendant agencies now project "[b]ased on current demand and consistent with prior similar years . . . that the EB-1 annual limit may be reached in mid-September. In years in which this occurs, immigrant visa numbers for applicants from all chargeability areas except

India and China become available again for issuance shortly thereafter, on October 1, with the start of the new fiscal year." Decl. of Ian Hillman ¶ 3 ("Hillman Decl."). Similarly, "[a]s of August 25, 2026, the worldwide EB-2 limit was reached, meaning that visa numbers in this category are unavailable for issuance. Visa numbers in this category will become available again with the start of FY-2027." *Id.* ¶ 6.

Neither of these factual developments, however, affect Plaintiffs for purposes of standing. These statutory caps are regularly met based on numerous factors. *See* Decl. of Andrew Parker ¶ 29 ("Revised Parker Decl.") ("It is common for the agencies to fully exhaust the supply of immigrant visas within a given EB category prior to the end of the fiscal year. Such an outcome is expected if the agencies are attempting to utilize all of the available visas."). And as noted above, even if they are capped, they reset each fiscal year. Thus, in a few weeks, these numbers will reset and the gates will reopen without precipitating any delay in EB-1A or EB-2 visa availability to Plaintiffs—much less one plausibly attributable to the Gold Card Program. Indeed, "[oversubscription] does not change the applicant's place in the queue or the number of visas available to them. For example, if the alien is in place 550 in the queue on July 1, and only 350 visas remain for the fiscal year, the alien will in theory be in place 200 in the queue at the start of the next fiscal year on October 1 (if the agencies use all of the visas). Whether the agencies exhausted the remaining 350 visas in July, August, or September makes no difference to the alien." Revised Parker Decl. ¶ 30. Thus, "[t]his normal occurrence at the end of the fiscal year is not indicative of any delay in visa availability for a given applicant." *Id.*

**C. Plaintiffs Fail To Demonstrate Any Delay In Their Adjudications**

Plaintiffs' processing-delay theory fares no better. The undisputed evidence shows that the Program has not slowed ordinary Form I-140 adjudications. To repeat: USCIS had "268

adjudicators assigned to the Form I-140 EB-1 and EB-2 workload." Selby ¶ 8. USCIS "has 11 adjudicators that review and adjudicate Gold Card filings as their primary duty" responsible for handling the so-far "80 . . . Form I-140G petitions" as of the date of the declaration. *Id.* USCIS did not transition any "employees currently assigned to the I-140 workload" to cover "adjudicating Form I-140G Gold Card petitions." *Id.* ¶ 9. Defendants have recorded "985 adjudicative hours dedicated to Form I-140G" for the Gold Card Program but have "logged *over 206,000 hours dedicated to Form I-140 EB-1 and EB-2 adjudications.*" *Id.* ¶ 10 (emphasis added). The Gold Card Program's adjudicative hours are a mere drop in the bucket and therefore "ha[ve] had no meaningful impact on Form I-140 EB-1 and EB-2 processing times." *Id.* ¶ 11.

Defendants have historically used different staff to work on different tasks for different programs. One group of adjudicators handles the I-140 workload for statutory applicants, and another handles the I-140G workload for Gold Card applicants. There is no effect of an increase in Gold Card applicants on the processing time or even the adjudication process at all for ordinary applicants. Even if there were, such effect is mathematically negligible. Taking the numbers above, Gold Card I-140G applicants constitute just 0.478% of I-140 applications. "As of August 20, 2026, out of the 88 Form I-140 [Gold Card] petitions submitted to USCIS for adjudication, seven petitions were denied, five petitions were withdrawn, 38 petitions received a conditional approval, and *three petitions* received a final approval. Out of the three final approvals, there has been no visa usage from oversubscribed queues by Gold Card beneficiaries." Decl. of Cara M. Selby ¶ 12 ("Revised Selby Decl.") (emphasis added). "Overall, this tally is a de minimis impact to future EB-1 or EB-2 beneficiaries that may be approved, and will have no impact on EB-1 and EB-2 beneficiaries that have already secured an earlier priority date." *Id.* Such a negligible mathematical percentage, even if cognizable, is insufficient to establish Article III standing.

In response, Plaintiffs fail to proffer any contrary non-speculative allegations of delay. They only speculate that there is "no guarantee" that Gold Card personnel might not otherwise work on ordinary petitions and that agency processing times necessarily reflect resource tradeoffs. But the absence of a guarantee is not enough to affirmatively establish causation for purposes of Article III. Plaintiffs rely on speculation directly contradicted by the testimony of the responsible USCIS official that no staff have been transferred. Shelby ¶ 9. Furthermore, Plaintiffs' theory of standing here is entirely overbroad: it would permit every pending applicant to challenge any agency action that initiated any policy that used personnel or affected staff bandwidth however remotely—whether that is a more generous parental leave policy, the decision to have staff issue more press releases, decisions to close offices for certain days or recognize additional holidays, or virtually anything at all. *See* MTD at 17.

Just because Defendants might adjudicate Gold Card petitions more quickly does not show that non-Gold Card petitions are adjudicated more slowly—or that any alleged discrepancy in processing times is attributable to the program as opposed to exogenous, case-specific factors. As noted above, a benefit to one person does not necessarily imply a harm to another. Plaintiffs seek to establish delay by focusing on the amount of time ordinary petitioners spend preparing their filings. Opp. at 18-22. But those preparatory burdens existed before the Gold Card Program and are imposed by the ordinary statutory and regulatory criteria, not by the challenged program. They are not caused by the Gold Card Program, and they would not be ameliorated by granting Plaintiffs their requested relief. Furthermore, pre-filing preparation time is not an agency processing delay. As Morrison admits, an applicant receives no priority date until filing. *See* Morrison Decl. ¶ 10. ("[a] person who has not yet filed has no priority date to preserve"). A Gold Card applicant who files first *per se* cannot displace an ordinary applicant who has not yet entered the queue.

Once filed, Gold Card petitions receive priority dates under the same rules as ordinary petitions. Expedited adjudication does not alter that date, does not make an unavailable visa available, and does not authorize a later-priority applicant to pass an earlier-priority applicant within the same category and chargeability area. At most, faster adjudication makes an applicant ready for final action sooner if a number is independently available. Whether that readiness eventually affects another applicant hinges upon the same speculation Plaintiffs advance in their visa cap theory of standing above.

The Morrison and Rand Declarations also argue that Gold Card applicants proceed more quickly through the visa adjudication process because "[a] Gold Card applicant may obtain a priority date while an ordinary self-petitioner who began preparing at the same time has not yet filed." Decl. of Doug Rand ¶ 23, ECF No. 37-11 ("Rand Decl."). To begin, these Declarations speculate on the time necessary to complete each respective application, which is ultimately unique to each applicant's individual circumstances. But as Ms. Selby notes in her declaration, in processing Gold Card petitions, "USCIS requires substantial evidence to establish the lawfulness of the [gift] funds," and identifies the various evidentiary and documentary submissions that the agency requests from Gold Card applicants, depending upon the source of the funds at issue. See Revised Selby Decl. ¶ 8. Moreover, Ms. Selby explains that "[s]imilar to an ordinary Form I-140 petition review, adjudication of Form I-140G petitions may generate further submissions through a request for evidence . . . or notice of intent to deny," and that "[a]s of August 20, 2026, only three Form I-140G petitions were approved without requiring an RFE. All remaining cases required RFEs, resulting in a current RFE rate for Gold Card Form I-140G petitions of 97%." *Id.* ¶ 9.

In any event, Plaintiffs have no recognized legal right to receive their visa adjudication in any timeframe. *See* MTD at 18. Any purported injury of delay, alongside any professional or

familial harm they allege to occur because of it, is not a legally cognizable injury. Indeed, an applicant does not have any statutory right to a specific timeline for the processing of his or her visa application regardless of the various circumstantial factors—whether administrative or case-specific—that influence processing times. *See Taj v. U.S. Dep't of State*, Civ. A. No. 22-1087 (RDM), 2022 WL 17250302, at *6 (D.D.C. Nov. 28, 2022) (rejecting substantive and procedural due process claim alleging unreasonable delay in adjudicating visa application); *Echeverri v. USCIS*, Case No. 23-CV-21711-RAR, 2023 WL 5350810, at *8 (S.D. Fla. Aug. 21, 2023) (same; noting that "[s]ince the government is a sovereign entity with the power to exclude noncitizens, a noncitizen seeking entry typically 'has only those rights regarding admission that Congress has provided by statute'" (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020))). Simply put, as courts have observed in other contexts, a "[p]laintiff does not have a 'clear right' to prompt adjudication of his visa petitions," "nor is there a statutory or regulatory right to adjudication within a specified time." *Adebayo v. U.S. Dep't of State*, No. 24-cv-2523 (LDH), 2025 WL 964096, at *3 (E.D.N.Y. Mar. 31, 2025) (quoting *Almakalani v. McAleenan*, 527 F. Supp. 3d 205, 226 (E.D.N.Y. 2021)).

## III. PLAINTIFFS CANNOT DEMONSTRATE ASSOCIATIONAL STANDING

Finally, Plaintiffs assert that AAUP and UAW have associational standing based on the injuries to their members. Opp. at 28-30. But as Defendants previously explained, none of the named Plaintiffs have shown standing and for the same reason the associations cannot show that their "members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In Plaintiffs' Opposition, AAUP and UAW introduce for the first time through declaration six unnamed AAUP and UAW members, Roes 1-2 and Does 1-4, respectively, who are chargeable to India and China and thus subject to those

countries' per-country visa limitations. Opp. at 23. To be clear, none of these newly introduced members are individual plaintiffs in this case. Rather, AAUP and UAW introduce them now to suggest that these members will face further delays because the visas they seek are oversubscribed or "backlogged." *Id.* Plaintiffs similarly introduce the declaration of Bruce Morrison to support the Roe 2 and Doe 4's allegations of delay attributable to the Gold Card. But this Declaration and its projections are methodologically flawed and thus dubious at best. *See* Revised Parker Decl. ¶¶ 5-22 ("There are significant errors in the assumptions and methodology used to reach these projections. . . . [T]he Gold Card program is expected to have no meaningful impact on wait times for visas for the individual plaintiffs or the anonymous members of the organizational plaintiffs.").

To begin, the fundamental premise of the Morrison Declaration's projections is erroneous. "The projection in the Morrison declaration . . . assumes that 1,592 Forms I-140G will be filed annually" but only 80 Gold Card requestors actually submitted Form I-140G petitions to USCIS for adjudication this year. *Id.* ¶ 6. And among those, only *three* received final approval, and, critically, *none* were chargeable to India or China. Revised Selby Decl. ¶ 12. Furthermore, the Morrison Declaration erroneously assumed every Gold Card applicant would receive approval. Revised Parker Decl. ¶¶ 10-11. Presently, USCIS anticipates 58 Gold Card applicants per year—a far cry from the 1,592 that the Morrison Declaration assumed. *Id.* ¶¶ 8-9. Moreover, the Morrison Declaration assumes that each Gold Card applicant will be accompanied by one derivative spouse or child, but no principal Gold Card applicant to date has been accompanied by a derivative family member. *Id.* ¶ 12. Morrison also assumed that the 1,592 Gold Card applicants would be drawn equally from EB-1 and EB-2 categories, but this assumption runs counter to common sense. "There is no reason why, for the foreseeable future, that the government would issue EB-2 visas to Gold Card program participants. Instead, all will likely be issued in EB-1 category. The EB-1 category

has historically had a much shorter wait for visas (for aliens from every country) than EB-2." *Id.* ¶ 13. Accordingly, the Gold Card Program will draw from whichever EB visa category that is least impactful to the visa allocation process. Finally, the Morrison Declaration assumes that the 1,592 Gold Card visas would result in just as many applicants chargeable to India and China missing out on those visas. This is fundamentally incorrect for a host of reasons, and Defendants respectfully refer the Court to the Revised Parker Declaration for a more fulsome explanation of the visa allocation process. *Id.* ¶¶ 14-22. Ultimately, AAUP and UAW rely on a host of erroneous assumptions, speculative assertions, and statistical smoke and mirrors in an attempt to manufacture a concrete injury that their members allegedly suffered. Plaintiffs' claims of delay and displacement are, at bottom, belied by both the facts and the realities of EB visa allocation and adjudication under existing law. AAUP and UAW thus lack associational standing for want of an injury in fact amongst their members. Accordingly, this Court must dismiss the organizational Plaintiffs' claims.

Plaintiffs document the burdens of temporary immigration status and the longstanding employment-based visa backlogs. But they do not—indeed cannot—plausibly allege that the Gold Card Program has caused, or even exacerbated, this phenomena or will imminently cause any particular Plaintiff to be deprived of a visa, wait longer for a visa, or experience slower petition processing or adjudication.

## **CONCLUSION**

For these reasons, this court should GRANT Defendants' motion to dismiss.

Dated: September 1, 2026

Respectfully submitted,

BRETT SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

/S/*Michael K. Velchik*

MICHAEL K. VELCHIK
Senior Counsel
Civil Division
United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 860-8388
E-mail: michael.velchik@usdoj.gov

STEPHEN ELLIOTT
Assistant Director
Civil Division, Federal Programs Branch

JORDAN A. HULSEBERG
Trial Attorney
Civil Division, Federal Programs Branch

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on September 1, 2026.

/s/Michael K. Velchik
MICHAEL K. VELCHIK